WATERMAN, Justice.
We :must decide whether a new .trial is required in this premises liability action. Brenda Alcala, a business guest ,at the Courtyard by Marriott[1] in Bettendorf, slipped and fell on its icy sidewalk, breaking her ankle. The jury found Marriott ninety-eight percent at fault and Alcala two percent at fault and awarded her damages of $1.2 million. The court of appeals concluded the district court’s jury instructions were erroneous and ordered a new trial. The court of appeals held the district court abused its discretion by denying *701 Marriott’s requested jury instruction on the continuing-storm doctrine, erred by submitting a negligent-training theory without substantial evidence, and erroneously instructed the jury on private industry safety codes. One judge dissented in part, concluding the district' court correctly declined 4o instruct on the continuing-storm doctrine based on the lack of evidence of the requisite storm. The dissent invited our court to clarify whether our standard of review for rulings declining requested instructions is for abuse of discretion or correction of errors at law. We granted Alcala’s application for further review.
For the reasons explained below, we conclude a new trial is required. We hold that our standard of review for rulings denying a requested jury instruction is for correction of errors at law. We conclude the district court erred by submitting a negligent-training theory without evidence of the standard‘of care for training employees on deicing or breach of that standard. Because the jury returned a general verdict, a new trial is required. A new trial is also required because the district court, over conflicting expert testimony, erroneously instructed the jury that an icy walkway violated a private safety code governing slip-resistant construction materials. We decline to decide the applicability of the continuing-storm doctrine. On remand, the parties and district court may address whether the doctrine should "be abandoned in light of our adoption of section 7 Of the Restatement (Third) of Torts, Liability for Emotional and Physical Harm. We vacate the opinion of the court of appeals, reverse the district court judgment, and remand the case for a new trial consistent with this opinion.
I. Background Facts and Proceedings.
Alcala, a software consultant, often traveled away from her Texas office and visited clients that were. implementing new software. Alcala made these in-person visits so that she could assist clients with final tests and troubleshooting. On January 18, 2010, Alcala arrived in Bettendorf on one such business trip, intending to spend an entire workweek with the client before returning to Texas. She checked into the Courtyard by Marriott in Betten-dorf, a few blocks from the office where Alcala would be working. Just before 8 a.m. on January 21," Alcala slipped and fell while' exiting the hotel en route to her client’s office, breaking her ankle.
In January 2012, Alcala filed suit against the defendants, alleging Marriott negligently caused her injuries because it allowed ice to accumulate[1] on its outdoor walkways, failed to maintain safe premises, failed to properly train their employees responsible for. addressing icy sidewalks, and failed to warn guests of the dangerous condition. The case proceeded to trial in February 2014.
A. The Weather. An official weather recap encompassing a brpad thirteen-county portion of eastern and southeastern Iowa described “an ice storm over much of eastern Iowa ... with widespread ice accumulations of ⅛ to ½ inch” that occurred on January 20. The recap did not mention anything about conditions, in that thirteen-county area on January 21, the day Alcala fell.
Witnesses at trial testified about the weather on the morning of January 21. The Marriott restaurant employee who attended to Alcala immediately after her fall testified “it was bad that morning” but stated she had no difficulty entering the building when she arrived for her shift at 5:15 a.m. and it was not raining or misting at the time Alcala fell nearly three hours later. The employee staffing the front *702 desk recalled no mist at the time Alcala fell. The hotel manager on duty at the time stated, “It was very gray, and I know there was a lot of moisture.” One of the paramedics who responded to the 911 call acknowledged “it was rough conditions out.” The other paramedic confirmed “there was some bad weather,” “it was quite icy,” and “[tjhere had been an ice storm” but could not remember precise details. The on-call physician who treated Alcala at the hospital after her fall explained that on his morning commute, sidewalks and roads were slick and icy and “there were accidents all over town.” Al-cala’s contact with her Bettendorf client testified “the weather conditions were not good” and affirmed “everyone in the Quad Cities was dealing with the effects of th[e] storm that morning.”
When asked if she recalled the weather on January 21, Alcala’s client contact testified, “We had some freezing rain” without quantifying the precipitation or specifying when it occurred in relation to Alcala’s injury. A paramedic testified generally that “[tjhere was a storm that morning.” A restaurant employee testified, “[Wje had just had, like, one of those freak ice storm things.” However, she further testified she “believe[dj” the freak ice storm went “into the morning hours as well.” She acknowledged that “the weather may have been kind of waxing and waning that morning, as it often does during storms.” Marriott witness Margaret DePaepe, the maintenance employee responsible for exterior walkways during the overnight shift, testified that whatever precipitation occurred “was slowing down” when her shift ended around 6 a.m. on January 21 and that any precipitation “had pretty much stopped” by 5:40 a.m.
Certified weather records from the National Climatic Data Center show mist and freezing rain at the Quad City International Airport in nearby Moline, Illinois— about eight miles south of the Marriott— beginning on the morning of January 20. The records show freezing rain last fell at the airport around 6 p.m. that day, while mist was virtually continuous throughout the day and into the night. About half an inch of precipitation accumulated that day, with only trace amounts accruing after 3 p.m. and the last trace accumulating no later than 7 p.m. Mist continued overnight and into the morning of January 21, ending around noon. However, there were no new accumulations, even in trace amounts. Ambient temperatures fluctuated slightly, reaching thirty-four degrees Fahrenheit by 2:15 a.m. on January 21 but decreasing to thirty-two degrees by 7:52 a.m. Overall data shows 0.53 inches of precipitation accumulating on January 20, with no accumulation after 7 p.m. on that day or at any point on January 21.[2]
Data from the Davenport Municipal Airport, about eight miles northwest of the Marriott, provides less detail. Unlike the Moline data, the Davenport data does not display a log of observations by hour. Rather, it is a daily summary. On January 20, the Davenport data reflects 0.32 inches of precipitation with “fog or mist” and “freezing rain or drizzle.” On January 21, it reflects trace amounts of precipitation, the same two conditions and an additional condition of “smoke or haze”— but because the data is a twenty-four-hour summary, it contains no specific timeline for these observations.
B. Training of Marriott Employees. No witness testified as to the standard of *703 practice for training employees on deicing walkways or what employees should be taught on that subject. DePaepe testified about her protocol for clearing ice and snow during a shift:
Q. Why don’t you tell the jury what your procedures are for shoveling and salting throughout your -shift. A. We just go outside and take a bucket of salt, and then we — take, at the time, a water thing.
Q. Like a pitcher, a seooper? A. It was a water pitcher. And we just sprinkled it everywhere that we could possibly find the ice.
Q. Okay. Now, if there’s snow or if there’s ice, as it’s falling, do you just do the sprinkling, or do you shovel as well? A. We shovel as best we could.
Q. And when you do shovel, do you do that before or after the saltings? A. Before, and then we put the salt down.
Q. So you try to get as much stuff out of the way and then you sprinkle salt on it? A. Yes.
[[Image here]]
Q. When you’re out there salting throughout the night, are you checking your own. work? Are you walking over the areas that you’re salting? A. We check our own work.
Q. Okay. So you’re sprinkling and you’re walking behind it; is that right? A. Yes.
Q. Now, what if you’re walking, walking as you’re sprinkling, walking back to put your salt and materials back in the shed, what if you notice a slick spot? A. Then we put more ... salt and we take care of that spot as soon as possible.
[[Image here]]
Q. So you have a standard operating procedure of going out at least three times in your shift and walking the premises and inspecting and shoveling and salting if necessary. A. Yes.
DePaepe added that no supervisor ever told her to limit the quantities of deicer used on exterior walkways.
On cross-examination; DePaepe elaborated on the extent of her training on snow and ice removal techniques:
Q. When you were trained by Marriott, did you have an understanding that if people did not properly attend to the outside sidewalk, if there was, say, an ice storm and the sidewalk became slippery, that it could become dangerous for people to walk on it? A. Yes.
Q. You were trained about that? A. Yes.
Q. That was important to you? A. Yes.
[[Image here]]
Q. How long were you taught that either salt or deicing compound could be on that sidewalk before it would become inert and not effective? Were you ever taught that? A. Hum-um.
Q. Is that a no? A. No.
Q. All right. Were you ever taught that you have to be concerned that simply spreading, salt would simply melt the ice and it might refreeze? A. Yes,
Q. And if it refroze, you would have to actually use a shovel, true? A. Yes.
Alcala’s: counsel asked DePaepe to comment on a copy of Marriott’s training materials:
Q. Do you recognize this [document entitled] outdoor safety measures? A. No.
Q. This Was produced by a Marriott lawyer, saying that these are the type of training that you received. You don’t remember seeing this? A. It’s been a while. I haven’t seen these for a while....
*704 Q. Fair enough. It may not' be fair. But would you--agree that snow and ice on an exterior sidewalk can be a hazard?
A. Yes.
Q. And would you agree that when ice forms, it would be important for a Marriott employee to remove it at once?
A. Yes.
Q. And if a Marriott employee didn’t do that, that would be a. problem for the customers. A. Yes.
Q., And my understanding is ¿ that when I asked you in your deposition if you had received any specific training whatsoever from Marriott as. to the proper way to remove ice, you just said they told us to go out there and shovel and salt. A. Yes.
On redirect examination, DePaepe clarified the types and frequency of training she received from Marriott:
Q. What kinds of training did you guys receive at the Marriott? A. What we did was go through videos, and when it gets close to the winter season, we have a meeting with all of the house people, all of our maintenance people, I should say, and they go through the procedures of what should ... be done and how it should be done.
Marriott’s counsel offered, and the court received as an exhibit, the packaging from the deicer DePaepe testified she used:
Q. Now, you can see from this bag— -it says that it works — it has melting power down to negative 15 degrees; is that fair? A. Yes.
Q. Okay. Now, on the back it has different things about how tó use, and the storage, it cautions you not to use too much, tells you only to apply about a quarter cup per square yard.- Does it say anything on here about needing to reapply every 15 minutes, every half-hour? A. No.
Q. Does it say anywhere here that this won’t work longer than an hour and a half or. two Fours? A. No.
- Q. Did-you have any -reason to believe that it wouldn’t? A. No.
Q. Had it been working appropriately when you’d been taking.-two-and-a-half to three-hour breaks in between throughout the night? A. Yes.
DePaepe testified she observed no ice problem on the sidewalk at those intervals. However, other witnesses contradicted her. One paramedic who responded to the 911 caE estimated the sidewalk in the location where Alcala feU was “eight or higher” on a ten-point scale of sHpperiness— where ten denotes “as slippery as it possibly could be” — even though DePaepe testified she had applied deicer at approximately 5:30 a.m. that day. The paramedic further testified the fire department’s personnel spread their own deicer on the sidewalk to allow the paramedics sufficient traction to reach and rescue Alcala safely.
Other evidence relevant to the training of Marriott’s employees came from the company’s operations manager for the Bettendorf location. The manager explained each maintenance person completes a checklist of tasks during each shift, and she affirmed DePaepe’s statement that “standard operating procedure” under the checklist required at least three inspections of walkways and floors during each eight-hour shift. The operations manager further stated, -“[I]t was understood with ... anyone working those shifts, that if it needed to be done more often, to absolutely do it more often.” No witness testified as to any deficiency in Marriott’s training procedures or documents.
C. Private Safety Standards. Alcala and Marriott -each presented an expert addressing industry standards for slip resistance and snow and ice removal. Rus *705 sell Kendzior testified on Alcala’s behalf about standards promulgated or approved by the American Society for Testing and Materials (ASTM) and the American National Standards Institute (ANSI). He opined the standards were applicable under the circumstances of this case even though they are voluntary, not mandatory. Section 5.13 of ASTM Standard F1637 requires walkway surfaces to be slip resistant under expected environmental conditions and use, especially when conditions may be reasonably foreseeable. Kendzior opined that the phrase “expected environmental conditions” accommodates the notion that during some weather events it may be impossible to provide a perfectly slip-resistant surface. Kendzior also discussed sections 5.7.1.1 and 5.7.Í.2 of the standard, which state exterior walkways “shall be slip resistant” and consider a slippery surface substandard. Kendzior testified, “[B]room-finished sidewalks are the industry standard. That’s what’s required by code.... [T]hey provide a very ample degree of slip resistance when dry.” In Kendzior’s opinion, however, an icy surface is by definition slippery and therefore substandard under that code.
ANSI standard A1264.2, to which Kendzior also referred, provides suggested protocols for clearing snow and ice from walkways and parking lots. Specifically, section 10.3.1 of the standard instructs land occupiers to use deicing compounds according to manufacturer instructions that may include reapplication after a length of time. Kendzior read from the ASTM and ANSI standards during his testimony while the jury viewed them via a projector, but neither party introduced a copy of them into evidence.
In contrast, Marriott’s expert, architect Alan Bowman, testified the slip resistant ASTM standard applied to the finish applied to the concrete surface, not slipperiness from snow or ice. He noted ASTM once considered promulgating a standard for snow and ice removal but scrapped the proposal because the organization’s members could not agree on an appropriate global standard. Bowman testified the Marriott’s sidewalk was constructed with broom-finished concrete that met the ASTM standard:
Q. Now, let’s look at the cement itself. What kind of a finish is on -this concrete?- A. Well, the metric that you use in terms of sidewalk performance is its slip resistance, and the- most cost effective way to achieve slip resistance with concrete is to broom finish it. You take a stiff bristle broom while the concrete is, what we call, thumbprint hard, and you drag the broom across the concrete and then let it finish curing, and that creates a fine corduroy effect. It’s about 16th-of-an-ineh-high grooves in the concrete. All of the measures that I’m familiar with, ASTM standards, for example, and the ANSI standards, consider ' broom-finished concrete to be slip resistant, and that’s on the scale of, basically, from zero, which would be just slick as glass, to one. And broom-finished concrete, wet or dry, always ranks between 0.5 and 0.8, so it’s considered, under wet or dry conditions, to be a slip-resistant surface.
Q. And this was broom-finished concrete. A. Everything, according to the Donahue site plan documents and everything that I witnessed in a walk-around of the Marriott facility, everything is broom-finished concrete.
Q. And that, I think, even Mr. Kendzior mentioned, is really the standard in the industry. A. Pardon me?
Q. Mr. Kendzior mentioned that’s the standard in the industry, broom-finished concrete. A. Yes.
*706 Q. Now, just to make it clear, though, that means that this surface is slip resistant wet or dry? A. Wet or dry, yes.
D. The Jury Instructions. Before submitting the case to the jury, the parties made a record on jury instructions. Marriott sought a jury instruction detailing the continuing-storm doctrine. This doctrine provides that, absent unusual circumstances, a premises occupier may “await the end of the storm and a reasonable time thereafter to remove ice and snow from an outdoor entrance walk, platform, or steps.” Reuter v. Iowa Tr. & Sav. Bank, 244 Iowa 939, 943, 57 N.W.2d 225, 227 (1953) (quoting Walker v. Mem’l Hosp., 187 Va. 5, 45 S.E.2d 898, 902 (1948)). Marriott contended it was entitled to this instruction because several witnesses testified generally that the weather was bad on the morning of January 21 and because the certified weather records from nearby locations reflected mist that day. See Rochford v. G.K. Dev., Inc., 845 N.W.2d 715, 718 (Iowa Ct.App.2014) (concluding the doctrine includes freezing rain, not just blizzards). Thus, Marriott asserted the jury should decide whether the storm was continuing when Alcala fell or, if it had ended, whether Marriott waited a reasonable time after the storm passed to remove the ice from the sidewalk where Alcala fell.
The district court refused to give the instruction because it concluded there was insufficient evidence supporting it. The district court concluded trace precipitation and mist do not constitute a “storm” within the plain meaning of the word or under our caselaw applying the continuing-storm doctrine. Indeed, the district court noted the weather records considered mist to be an obscuration like fog, not a type of precipitation. Furthermore, the district court concluded witnesses’ general testimony that roads and sidewalks were slick and icy on the morning of January 21, that “it was rough conditions out,” or that “the weather conditions were not good” spoke only to the persisting effects of the storm, not whether it was actively continuing at times relevant to this case.
The court also overruled Marriott’s objections to two additional instructions. First, Marriott contended the ASTM and ANSI standards were not applicable and it was therefore inappropriate to instruct the jury it could conclude violation of the standards was evidence of negligence. Second, Marriott contended there was insufficient evidence to support improper training, one of Alcala’s asserted specifications of negligence. The district court concluded a jury instruction on industry standards was appropriate despite the experts’ conflicting opinions on the standards’ applicability. It also concluded DePaepe’s testimony was substantial evidence supporting an instruction including improper training as a specification of negligence.
Instruction No. 20, as submitted to the jury, stated,
American Safety and Testing Materials (ASTM) Standard Practice for Safe Walking Surfaces requires exterior walkways shall be maintained so as to provide safe walking conditions (5.7.1). In addition, said standards require that exterior walkways shall be slip resistant (5.7.1.1). Finally, if an exterior walkway is slippery, it is to be considered substandard (5.7.1.2).
American National Standards Institute (ANSI) require that where snow and ice exists in pedestrian walkways, safe maintenance techniques shall include plowing, shoveling, deicing, salting or ice melting chemicals, and sanding, as needed (10.3.1).
You may consider a violation of these standards as evidence of negligence.
*707 Instruction No. 16 allocated to Alcala the burden of proving Marriott was negligent in at least one of four ways: (1) improper training, (2) inadequate maintenance, (3) failing to inspect the walkway, or (4) failing to provide a slip-resistant walkway.
E. The Verdict and Appeal. The jury returned a general verdict finding Marriott negligent without identifying which specification or specifications of negligence Alca-la proved. The jury allocated ninety-eight percent of the fault to Marriott, two percent to Alcala, and awarded Alcala total damages of $1.2 million for medical expenses, lost wages, pain and suffering, and loss of bodily function. Marriott moved for judgment notwithstanding the verdict, remittitur, or new trial, asserting the district court erred in denying a continuing-storm instruction and in submitting the other instructions to which Marriott objected.' The district court denied the motion.
Marriott appealed, and we transferred the case to. the court of appeals. The court of appeals ordered a new trial because it concluded the evidence supported a continuing-storm instruction and did not support the instructions on industry standards and improper training. One judge dissented in part, concluding the district court correctly refused to instruct on the continuing-storm doctrine. We granted Al-cala’s application for further review.
II. Standard of Review.
We have said “[w]e review a court’s refusal to give an instruction for an abuse of discretion, while we review challenges to jury instructions for correction of errors at law.” Anderson v. State, 692 N.W.2d 360, 363 (Iowa 2005). However, this distinction is relatively recent, growing primarily out of a 2003 decision. See State v. Piper, 663 N.W.2d 894, 914 (Iowa 2003), overruled on other grounds by State v. Hanes, 790 N.W.2d 545, 551 (Iowa 2010). In Piper, we stated “review of alleged instructional error depends on-the nature of the supposed error” and cited a case indicating the refusal to give an inference instruction on alleged spoliation is properly reviewed for an abuse of discretion. Id. (citing State v. Langlet, 283 N.W.2d 330, 336 (Iowa 1979) (holding the district court did not abuse its discretion in denying a spoliation instruction as there was no evidence of an intent to destroy evidence)).
We' conclude Langlet correctly states the standard of review of the district court’s refusal to give an inference instruction on spoliation because that instruction acts as a discovery sanction and discovery sanctions are discretionary. See Hendricks v. Great Plains Supply Co., 609 N.W.2d 486, 491 (Iowa 2000) (discussing the spoliation inference and its remedies); Farley v. Ginther, 450 N.W.2d 853, 856 (Iowa 1990) (noting the discretionary nature of discovery sanctions). However, the standard of review applied in Langlet and referenced in Piper does not extend to all refusals to give a requested jury instruction.
“Iowa law requires a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions.” Sonnek v. Warren, 522 N.W.2d 45, 47 (Iowa 1994); accord Weyerhaeuser Co. v. Thermogas Co., 620 N.W.2d 819, 823-24 (Iowa 2000); Herbst v. State, 616 N.W.2d 582, 585 (Iowa 2000). The verb “require” is mandatory and leaves no room for trial court discretion. Thus, we clarify today that absent the discretionary component present in Langlet, we review refusals to give a requested jury instruction for correction of errors at law. See, e.g., DeBoom v. Raining Rose, Inc., 772 N.W.2d 1, 5, 11-14 (Iowa 2009) (reviewing multiple jury instruction claims, including refusal to give a *708 requested pretext instruction, for errors at law); Koenig v. Koenig, 766 N.W.2d 635, 637 (Iowa 2009) (reviewing a district court’s refusal to give a general negligence instruction for errors at law); Banks v. Beckwith, 762 N.W.2d 149, 151 (Iowa 2009) (reviewing a district court’s refusal to give a res ipsa loquitur instruction for errors at law); Pexa v. Auto Owners Ins. Co., 686 N.W.2d 150, 160 (Iowa 2004). To the extent our cases perpetuate the Piper distinction and-extend the abuse-of-discretion analysis to nondiscretionary refusals to give requested jury instructions supported by the evidence and applicable law, we overrule them on that issue.[3]
III. Analysis.
A. Negligent Training. We must decide whether the. district court erred by submitting the negligent-training theory without any testimony on the standard of care for training or its breach. It is axiomatic that proof of the applicable standard of care and. its breach are required to recover in tort. See Thompson v. Kaczinski, 774 N.W.2d 829, 834 (Iowa 2009) (“An actionable claim of negligence requires ‘the existence of a duty to conform to a standard of conduct to protect others, [and] a failure to conform to that standard....’” (quoting Stotts v. Eveleth, 688 N.W.2d 803, 807 (Iowa 2004))). Dismissal is required when the record contains no evidence regarding the applicable standard of care or its breach. See Godar v. Edwards, 588 N.W.2d 701, 709-10 (Iowa 1999) (affirming directed verdict in defendant’s favor on claims against employer for negligent hiring, retention, and supervision); Hartig v. Francois, 562 N.W.2d 427, 430-31 (Iowa 1997) (holding defendant was entitled to directed verdict on negligence claims based on, insufficient evidence of the standard of care or its breach); Fisher v. Dallas County, 369 N.W.2d 426, 431 (Iowa 1985) (affirming dismissal because the “record contains no evidence regarding that standard of care” or its breach).
Marriott argues on appeal that reversal is required because “[t]he record contains no evidence of a standard of care imposing a discrete duty on Marriott to instruct employees about a specific period of time that a particular deicing compound will remain effective.” Alcala argues expert testimony was not required to establish the standard , of care for training employees on ice removal. Regardless, there must be some evidence or testimony to support the instruction on negligent training. No witness, lay or expert, testified that Marriott should haVe trained DePaepe on the durational effectiveness of the deicer. Cf. Tomeo v. Thomas Whitesell Constr. Co., 176 N.J. 366, 823 A.2d 769, 777 (2003) (affirming summary judgment dismissing negligent-training claim as to employee’s use of snowblower, concluding “[n]o special training was required to be given ... because it is! a consumer product” with adequate warnings and instructions). No expert or lay witness testified about any *709 shortcoming in Marriott’s training or what training should be provided. Alcala argues the jury can find Marriott breached a duty to train DePaepe by connecting these dots: there was ice on the. sidewalk; therefore, DePaepe did not apply deicer properly; therefore, Marriott did not train her properly. If that is sufficient,. then going forward, employers could be sued for negligent training whenever there is an avoidable accident. We conclude that the evidence in this case was insufficient to support a negligent-training instruction or specification of negligence.
Other courts have held that negligent-training claims fail as a matter of law without testimony establishing the standard of practice for training employees for the job at issue. Judge Merrick Garland recently surveyed many such decisions in Burke v. Air Serv International, Inc., 685 F.3d 1102, 1106-07 & n. 2 (D.C.Cir.2012) (affirming summary judgment dismissing negligent-training claim). See also Moore v. District of Columbia, 79 F.Supp.3d 121, 144-45 (D.D.C.2015) (surveying authorities and granting summary judgment dismissing negligent-training claims). It is not enough to show the mistakes or negligent conduct of the employee; rather, to recover against the employer under a negligent-training theory, evidence of a specific standard of care for training and its breach is required. See Carter v. Nat’l R.R. Passenger Corp., 63 F.Supp.3d 1118, 1156-57 (N.D.Cal.2014) (granting summary judgment dismissing negligent-training claim because “[pjlaintiffs do not link any of the evidence [of the errors of an Amtrak train engineer] to any specific federal standard of care [for training] ... or explain how the evidence, if credited by the jury, would establish a violation of such a standard”); Wimer v. State, 122 Idaho 923, 841 P.2d 453, 455 (Ct.App.1992) (affirming summary judgment dismissing claim that the- state negligently trained game officers who charged elk hunters with criminal violations; concluding affidavit testimony that the “training and supervision must have been deficient because of the manner in which this investigation was conducted” was insufficient to support an inference based on a “single incident standing by itself’ (quoting Anderson v. City of Pocatello, 112 Idaho 176, 731 P.2d 171, 181 (1986))).
In Inmon v. Crane Rental Services, Inc., the Arizona Court of Appeals affirmed a partial summary judgment dismissing a negligent-training claim. 205 Ariz. 130, 67 P.3d 726, 733 (Ariz.Ct.App.2003), overruled on other grounds by Tarron v. Bowen Mach. & Fabricating, Inc., 225. Ariz. 147, 235 P.3d 1030, 1036 (2010) (en banc). Charles Inmon and Mark Cummings, ironworkers, were injured when a loaded crane operated by. Eddie De La Torre tipped over at their jobsite. Id. at 727-28. They sued his employer, a crane rental company, alleging it was independently negligent in training him. Id. at 728. The plaintiffs expert testified he “could not say that De La Torre was improperly trained, but only that his actions did not demonstrate proper training.” Id. at 733. The trial court granted the crane rental company’s motion for summary judgment on that issue, noting the lack of testimony “to indicaté what training was omitted” and concluding the “[failure to demonstrate competence is not automatically a showing of inadequate training.” Id. The appellate court agreed and rejected the plaintiffs’ argument that the fact finder could infer negligent training, stating, “[I]n the absence of facts specifying in what way De La Torre’s training- or lack thereof was negligent, ... there is no evidence showing that such negligent training was the proximate cause of Plaintiffs’ injuries.” Id. We see the same failure of proof as to Alcala’s negligent-training claim.
*710 Alcala cites no case from any jurisdiction upholding a recovery on a record devoid of testimony as to the standard for training for the job at issue and devoid of testimony as to how the training fell short. We hold it was error to submit negligent training as one of the specifications of Marriott’s negligence. The jury returned a general verdict without specifying which grounds of fault Alcala proved. A new trial is required after a general verdict is returned for the plaintiff if the evidence was insufficient to submit one of several specifications of negligence. Asher v. OB-Gyn Specialists, P.C., 846 N.W.2d 492, 497 (Iowa 2014). That is what happened here.
B. Private Safety Codes. We conclude a new trial is also required based on the district court’s prejudicial error in the jury instruction on the ASTM standards. “We have on a number of occasions found instructions that unduly emphasized certain evidence were flawed and required reversal.” Burkhalter v. Burkhalter, 841 N.W.2d 93, 106 (Iowa 2013); see also Olson v. Prosoco, Inc., 522 N.W.2d 284, 287 (Iowa 1994) (“[E]ven instructions correctly stating the law should not give undue emphasis to any particular theory, defense, stipulation, burden of proof, or piece of evidence.”). The district court went beyond unduly emphasizing certain evidence — the trial judge adopted the position of plaintiffs expert over conflicting testimony of the defense expert in Instruction No. 20:
American Safety and Testing Materials (ASTM) Standard Practice for Safe Walking Surfaces requires exterior walkways shall be maintained so as to provide safe walking conditions (5.7.1). In addition, said standards require that exterior walkways shall be slip resistant (5.7.1.1). Finally, if an exterior walkway is slippery, it is to be considered substandard (5.7.1.2).
[[Image here]]
You may consider a violation of these standards as evidence of negligence.
The defense expert, Bowman, testified the ASTM standard is inapplicable to snow and ice removal and instead governs the methods and materials used for constructing walkways. Experts for both sides agreed the type of slip-resistant, broom-finished concrete used in the construction of Marriott’s sidewalk complied with ASTM standards when dry. The only reason the sidewalk was slippery was the presence of ice. Bowman further gave uncontroverted testimony that ASTM had considered adopting a standard for snow and ice removal but abandoned the idea due to lack of agreement on such a standard. The existing ASTM standards do not mention ice or snow. Yet the jury was essentially instructed that an icy sidewalk is substandard. That is not how we interpret the ASTM standard. Alcala cites no case from any jurisdiction holding ASTM standard 5.7 is violated when an otherwise compliant broom-finished concrete surface is icy, and we found no such case in our own research.
Even assuming the expert testimony was sufficient to generate a jury question regarding the applicability of the standard, the district court erred by taking one side and telling the jury the standard was violated by icy conditions. See Almonte v. Averna Vision & Robotics, Inc., 128 F.Supp.3d 729, 744 (W.D.N.Y.2015) (“Usually, when there is a factual question about the applicability of two competing industry standards, it is for the fact-finder to determine which standard applies.”). When experts disagree, the jury should be instructed to decide whether the standard applies. See Rupolo v. Oshkosh Truck Corp., 749 F.Supp.2d 81, 43 (E.D.N.Y.2010) (“[T]he *711 applicability of the ANSI and OSHA standards is a factual question_Accordingly, ... it should be for the fact-finder to determine whether [the expert’s] reliance on the ANSI and OSHA standards is appropriate.”). The district court erred in giving Instruction No. 20, and that error requires a new trial.
C. The Continuing-Storm Doctrine. The court of appeals majority concluded Marriott was entitled to its requested instruction on the continuing-storm doctrine. The dissenting judge concluded the evidence was insufficient to support a jury instruction on the doctrine. Because we have determined that the instructional errors discussed above require a new trial, we need not decide whether the district court erred by refusing Marriott’s requested instruction on the continuing-storm doctrine. We recognize the issue will arise again on remand if Marriott renews its request for an instruction on the doctrine.
We adopted the continuing-storm doctrine in Reuter, 244 Iowa at 943, 57 N.W.2d at 227. Quoting from a Virginia case, we established
the rule that a business establishment, landlord, carrier, or other inviter, in the absence of unusual circumstances, is permitted to await the end of the storm and a reasonable time thereafter to remove ice and snow from an outdoor entrance walk, platform, or steps. The general controlling principle is that changing conditions due to the pending storm render it inexpedient and impracticable to take earlier effective action, and that, ordinary care does not require it.
Id. (quoting Walker, 45 S.E.2d at 902).
In Rockford, the court of appeals concluded inclement winter weather could constitute & storm even if it is not a blizzard. 845 N.W.2d at 718. In. that case, however, it was undisputed the- plaintiffs fall occurred during freezing rainfall. See id. Thus, the holding in Rockford does not clearly extend to mist or other precipitation leaving no accumulation.
Iowa courts have applied the continuing-storm doctrine in a few other eases. For example, in Wailes v. Hy-Vee, Inc., the court of appeals concluded the district court correctly gave a jury instruction on the continuing-storm doctrine when the plaintiff challenged the timing of the defendant’s snow removal but snow was still falling when the plaintiff was injured. 861 N.W.2d 262, 265-68 (Iowa Ct.App.2014). We also applied the continuing-storm doctrine and granted a defendant judgment notwithstanding the verdict when “a trace of show was recorded” on the day of the plaintiffs fall, “[i]t had been snowing off and on all morning,”-and “it was still snowing” at the time the plaintiff fell. Hovden v. City of Decorah, 261 Iowa 624, 628, 155 N.W.2d 534, 537 (1968), superseded by statute, 1984 Iowa Acts ch. 1002, § 1.
This court has acknowledged “[t]he feebleness of human ... efforts in attempting .to cope with the power of the elements.” Staples v. City of Spencer, 222 Iowa 1241, 1244, 271 N.W. 200, 202 (1937). The continuing-storm doctrine suspends a property owner’s general duty to exercise reasonable care in warning of or removing snow and ice hazards until a reasonable time after the storm because continually clearing ice and snow during an ongoing storm would be impracticable. Reuter, 244 Iowa at 943, 57 N.W.2d at 227; Mattson v. St. Luke’s Hosp. of St. Paul, 252 Minn. 230, 89 N.W.2d 743, 745 (1958); Walker, 45 S.E.2d at 902.
Acala in her application for further review argued for the first time that the continuing-storm' doctrine is no longer good law under the Restatement (Third) of Torts, Liability for Physical and Emotional *712 Harm. The parties, however, did not address the impact of the Restatement (Third) on the continuing-storm doctrine in their appellate briefs preceding the court of appeals decision or in district court before the jury was instructed. Neither the district court nor court of appeals addressed whether the continuing-storm doctrine should be abandoned in light of our adoption of section 7 of the Restatement (Third) of Torts in Thompson in 2009. 774 N.W.2d at 834-35; cf. Crawford v. Extended Stay Am., LLC, No. 2007-CA-001127-MR, 2008 WL 2610456, at *4 (Ky.Ct.App. July 3, 2008) (Aeree, J., concurring) (inviting Kentucky Supreme Court to revisit “no-duty” rule for natural snow and ice accumulations in light of section 7 of the Restatement (Third)). We prefer to wait to decide the issue with the benefit of a district court ruling and full adversarial briefing. Accordingly, we decline to decide it now. See Hagenow v. Schmidt, 842 N.W.2d 661, 677 (Iowa 2014) (“[Neither the parties nor the district court raised the provisions of the Restatement (Third) when instructing the jury in this case. We defer for another day our consideration of these provisions — ”). The parties are free to brief and argue that issue on remand and may develop a different eviden-tiary record on weather conditions in the new trial.
IV. Disposition.
For the foregoing reasons, Marriott is entitled to a new trial. We vacate the decision of the court of appeals, reverse the district coürt judgment, and remand the case for a new trial consistent with this opinion.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.
All justices concur except HECHT, WIGGINS, and APPEL, JJ., who concur in part and dissent in part.

. Appellants are Marriott International, Inc. and Courtyard Management Corporation, doing business as Quad Cities Courtyard by Marriott. We refer to the appellants collectively as Marriott. •

. The records list total precipitation as "0.00" for January 21. In context, this does not include even trace amounts because other dates in January show total precipitation as "T,” standing for "trace.”

. See, e.g., State v. Guerrero Cordero, 861 N.W.2d 253, 258 (Iowa 2015); State v. Edouard, 854 N.W.2d 421, 431 (Iowa 2014); Asher v. OB-Gyn Specialists, P.C., 846 N.W.2d 492, 496 (Iowa 2014); Hagenow v. Schmidt, 842 N.W.2d 661, 670 (Iowa 2014); State v. Frei, 831 N.W.2d 70, 73 (Iowa 2013); Crawford v. Yotty, 828 N.W.2d 295, 298 (Iowa 2013); State v. Becker, 818 N.W.2d 135, 140 (Iowa 2012); State v. Marin, 788 N.W.2d 833, 836 (Iowa 2010); State v. Lyman, 776 N.W.2d 865, 876 (Iowa 2010); State v. Reynolds, 765 N.W.2d 283, 288 (Iowa 2009); Smith v. Koslow, 757 N.W.2d 677, 679-80 (Iowa 2008); Summy v. City of Des Moines, 708 N.W.2d 333, 340 (Iowa 2006); In re Det. of Palmer, 691 N.W.2d 413, 416 (Iowa 2005); Kiesau v. Bantz, 686 N.W.2d 164, 171 (Iowa 2004). Of course, clarifying the standard of review for jury instruction challenges does not disturb the substantive legal conclusions in these decisions.