# IN THE COURT OF APPEALS OF IOWA

No. 21-1866
Filed October 25, 2023

**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**ZACHARIAH COULEYON SIDNEY,**
       Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.

The defendant challenges his convictions on five counts of sexual abuse in the third degree. **AFFIRMED.**

Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

Considered by Greer, P.J., and Schumacher and Ahlers, JJ.

**GREER, Presiding Judge.**

A jury convicted Zachariah Sidney of five counts of third-degree sexual abuse against M.S.[1]  Sidney appeals, arguing (1) the court wrongly declared a mistrial over the parties' objections after learning Sidney had been exposed to COVID-19, which constituted an abuse of discretion and violated his right to be free from double jeopardy when he was tried and convicted by a different jury in a new trial; (2) the district court erred by giving an incomplete jury instruction defining the "by force or against will" element; and (3) the greater weight of the credible evidence does not support his convictions, so the district court should have granted his motion for new trial.  Upon our review, we do not reach the merits of Sidney's claims about the court declaring a mistrial, we find no error in the challenged jury instruction, and also find the district court did not abuse its discretion in denying Sidney's motion for new trial.  We affirm.

**I. Background Facts and Proceedings.**

Sidney was charged with five counts of third-degree sexual abuse against M.S., who was initially believed to be his daughter.[2]  Two of the charges were

---

[1] In counts I and II, Sidney was convicted of engaging in a sex act with M.S. when she was thirteen to fifteen years old and a member of his household.  *See* Iowa Code § 709.4(1)(b)(2) (child of twelve or thirteen), (1)(b)(3)(a) (child of fourteen or fifteen and the child is a member of the person's household) (2013).  In counts III through V, Sidney was convicted of engaging in a sex act by force or against the will of M.S.  *See id.* § 709.4(1)(a) (sex act committed against the force or will of the person).  All five convictions are class "C" felonies.

[2] M.S. lived in Sidney's home from the age of thirteen until she went to college; both M.S. and Sidney believed M.S. was Sidney's daughter during this time period.  But later DNA testing—completed after M.S. made reports to the police about Sidney's actions—established he is not biologically related to her.  While Sidney was originally also charged with incest, the State dismissed that charge after receiving the DNA results.

based on allegations Sidney engaged in sex acts with M.S. before she was sixteen, while the other three were based on allegations Sidney engaged in sex acts with M.S. by force or against her will when she was sixteen or older. Sidney entered pleas of not guilty, and the case proceeded to a jury trial.

The case first went to trial in August 2021. On the second day—after the jury was impaneled and opening arguments were completed—the court was informed that Sidney had been exposed to COVID-19 and the unit where he was being held at the local jail was "going into a lockdown." Over the State's and Sidney's objection, the court sua sponte declared a mistrial, reasoning it was necessary for the "health of the community in general and the jury members in specific."

The second trial took place in October 2021. M.S. testified she went to live with Sidney in 2013, when she was twelve or thirteen[3]—after first her mother and then her grandmother were no longer able to take care of her. M.S. lived with Sidney; his wife, Jackie; and their two sons in an apartment in Des Moines. She had been living with Sidney for only a few months when one night, while M.S. was sleeping in his bed after having a nightmare, Sidney used his hand to rub "up the back of [her] thigh to [her] butt." M.S. was shocked and asked Sidney what he was doing; he was teary-eyed and showed remorse. But then Sidney began sleeping in M.S.'s bed with her sometimes, telling his wife M.S. needed him because of her night terrors. Some nights Sidney would "rub himself against [her]" with their clothes on. As time progressed, Sidney began pulling both his and M.S.'s clothes

---

[3] M.S. was born in the fall of 2000.

down and then rubbing his penis against the outside of her vagina, anus, or both. According to M.S., Sidney also touched her vagina with his mouth and fingers. While the family lived in Des Moines, these incidents occurred a couple times each month.

Then, in the summer of 2015 (while M.S. was still fourteen and before her freshman year began), the family moved from Des Moines to Ankeny. After they moved to the new home, M.S. had her own bedroom—separate from Sidney and Jackie's sons. In this new home, the sexual contact continued but, according to M.S., it "stopped being just touching of a variety of parts, and it became actual penetration" with Sidney using his penis to penetrate M.S.'s vagina and anus. M.S. testified:

> So as the relationship, both sexual and just a normal relationship, would progress, he became more aggressive with what he wanted out of me in both sexual relationships and as a daughter.
> So the abuse would happen inside, like, during the sexual interaction or if he was just upset with me in general. So many times I'd get choked or slapped or shoved or pushed against the wall or objects.

When M.S. would tell Sidney she did not want the sexual encounters to happen anymore, he would get defensive and invoke religion. And Sidney justified his actions by telling M.S. he was having sexual contact with her to "correct [her]." When she became more insistent that it should stop, Sidney "would get more angry. If [she] asked to stop while [they] were actually having the sexual encounter, [she] suffered physical abuse, choking, pushing [her] head into the bed, slapping. He'd get angry and say mean things to [her] or call [her] derogatory names." This continued throughout M.S.'s high school years; while it started with

Sidney occasionally sleeping in M.S.'s bed, "he'd sleep in [her] bed every day, and if not every day, most days out of the year" by the time she left for college.

M.S. testified that there were times she gave Sidney verbal permission for a sex act but did so because she did not feel "truly free to deny him permission." She testified that if she denied him:

> He'd get really angry. At first, it would start with really derogatory terms, and then he actually put his hands on me aggressively, like slapping, choking, pushing my head into the bed or the pillow.
> He would also ask me if I was seeing someone, and that's why I didn't want to share myself with him, and I wasn't. But I knew that if I didn't let him, he would think that, and I would have to suffer even more if he thought I had a boyfriend.
> So a lot of times, it was really never me just—when he asked me and—it was never times as he asked, I would be—I'd have a positive response towards him. A lot of times, we'd argue for several minutes up to hours, and then I'd get tired, and I'd just say "okay."

When asked if there were times a sex act occurred without her saying "okay," M.S. testified that happened, adding, "Well, it wasn't like him forcing me down. I just turned away, and he'd just—he'd do it anyway."

M.S. moved out of the family home in Ankeny to go to college. While she was away, Sidney would contact M.S. through video calls and ask her to "show him [her] vagina and [her] butt and [her] breasts while he was back at home." And the sexual encounters continued to occur when M.S. was home.

Then, in December 2019, Sidney drove to M.S.'s college to pick her up for Christmas break. While in her dorm room, Sidney penetrated M.S. anally. M.S. was in a lot of pain and kept trying to pull away, but Sidney did not seem to care. When she actually pushed away from him, Sidney "got really angry. . . . He looked like he was full of rage, and he started choking [her] and pushed [her] against the

bed and kind of wrestled [her] for a moment." At some point, Sidney let M.S. go, and she reported needing to use the bathroom. Once out of the room, M.S. sprinted down the hallway until she found someone—a resident advisor for the dorm (RA).

Both M.S. and the RA testified that when M.S. found him, she began repeatedly asking for help. They decided to walk to the security office on campus. During the walk, M.S. spoke to Jackie on the phone, telling her about the sexual abuse and how long it had been happening. According to M.S., Jackie convinced her not to make a report to the police and to just stay on the phone with her while riding back to Ankeny with Sidney. Jackie "promised [her] when [they] got back home, she would talk it out with [her] and figure something out, and if he did do these things to me, put him in jail." M.S. complied with Jackie's directive. But the sex acts continued after M.S. returned to the family home. Eventually, after Sidney begged for a number of days, and feeling Jackie did not believe her and doing so would help her be able to return to college, M.S. recanted to Jackie.

A few months later, while back at college and with encouragement from others, M.S. made a report to the local police, alleging that Sidney had been sexually abusing her for years. A couple of police officers traveled to Ankeny to speak with Sidney and execute a search warrant on the family home. Detective Troy Schneider, who was one of the officers, spoke with Sidney for several hours. About forty-five minutes of the recorded discussion was played for the jury. During that portion, Sidney admitted to having a sexual relationship with M.S., telling the detective he slept in M.S.'s room three or four nights each week. Sidney told the detective that he used the sexual acts to correct M.S.'s behavior or way of thinking.

While admitting there were times M.S. told him she did not want their relationship to include sex acts, Sidney described the sexual relationship as consensual and claimed M.S. thought of him as "her man." As part of the execution of the search warrant, the bedding from M.S.'s room was seized. Later testing identified Sidney's sperm on the bedding.

The jury found Sidney guilty of all five counts of third-degree sexual abuse, and he was later sentenced to five terms of incarceration, each lasting for a period of up to ten years, which the court ordered him to serve consecutively. Sidney appeals.

## II. Discussion.

### A. Mistrial.

Sidney claims the district court abused its discretion when, on the second day of his trial, after the court learned he had been exposed to COVID-19 while being held in the local jail, it sua sponte declared a mistrial over both parties' objections. But "[a]ny error in the first trial is not reviewable in an appeal of the second trial." *State v. Longdon*, No. 06-0778, 2008 WL 5003743, at \*2 (Iowa Ct. App. Nov. 26, 2008) (citing *State v. Ash*, 244 N.W.2d 812, 817 (Iowa 1976)).

Sidney also claims his right to be free from double jeopardy was violated when he was tried and convicted by a different jury in a second trial. However, Sidney failed to move for dismissal based on the issue of double jeopardy before the second trial, which is necessary to preserve error. *See id.* ("A claim of double jeopardy arising from the declaration of a mistrial in an earlier trial must be raised before the second trial." (citing *State v. Harrison*, 578 N.W.2d 234, 238 (Iowa 1998))); *see also* Iowa R. Crim. P. 2.11(4)(a) (requiring "[d]efenses and objections

based on defects in the institution of the prosecution" to be raised prior to trial).

Under this reasoning, we do not consider Sidney's claims about the court declaring

a mistrial.

**B. Jury Instruction.**

Next, Sidney argues the district court should have given the jury instruction

he requested on the meaning of "by force or against the will of" rather than using

the State's proposed instruction.[4]  The instruction the district court ultimately gave

closely follows the language of Iowa Code section 709.5.[5]  As given, the instruction

stated:

> In Counts III–V (Instructions Nos. 15-17), the State must prove that the defendant committed a sex act "by force or against the will" of M.S.  In order to do so, however, the State does not have to prove that M.S. physically resisted the defendant's acts.
> You may consider all of the circumstances surrounding the defendant's act in deciding whether the act was done by force or against the will of M.S.

Sidney proposed the model instruction, which includes two additional lines:

> Concerning element number 2 of Instruction No. _____, the State must prove that the defendant committed a sex act "by force or against the will" of (victim).  In order to do so, however, the State does not have to prove that (victim) physically resisted the defendant's acts.  *The force used by the defendant does not have to be physical.  It may consist of threats of violence against [(]victim) or another person which overcame (victims) will by fear.*

---

[4] This claim on appeal applies to only counts III, IV, and V, as only those three charges required a finding that Sidney acted with force or against M.S.'s will in perpetrating the sex act.

[5] Iowa Code section 709.5, which is titled "[r]esistance to sexual abuse," states:
> Under the provisions of this chapter it shall not be necessary to establish physical resistance by a person in order to establish that an act of sexual abuse was committed by force or against the will of the person.  However, the circumstances surrounding the commission of the act may be considered in determining whether or not the act was done by force or against the will of the other.

> You may consider all of the circumstances surrounding the defendant's act in deciding whether the act was done by force or against the will of (victim).

Iowa State Bar Ass'n, Iowa Crim. Jury Instruction 900.10 (emphasis added).

On appeal, Sidney reiterates the argument he made to the district court when arguing for his proposed instruction; he claims the two sentences that were removed in the jury instruction "touched directly on his defense that the sex acts were consensual." In the district court, trial counsel argued:

> We believe that that instruction is important to add in there because I fear the instruction that is given allows the jury to find that if someone were to be convinced to engage in sex acts, by either cajoling them, by bugging them, by simply showering with love or affection, or doing things that would cause them to otherwise say "All right. Fine. I'll go ahead and do it." Similar to a husband and wife situation they probably see every day, it will allow them to find that that was against the will of the victim.
> I think that those two statements indicate that there is a higher burden, that there—that there is not just—this goes higher than just convincing. It actually results in overcoming someone's will.
> So we believe those two statements that are contained within the stock instruction help better guide the jury to understand the threshold standard that they must meet here.

The State countered that the instruction it proposed "mirror[ed] the language of Iowa Code section 709.5" and that Sidney's proposed instruction was misleading as it limited jury consideration of how someone's will might be overcome to one example and thus, could suggest to the jury there is only one way, when there can be other circumstances a jury should weigh. In addressing the competing arguments, the district court referenced *State v. Bauer*, and opined that "[by force or against one's will] is broader than just threats of violence to overcome their fear . . . broader than one example." 324 N.W.2d 320, 322 (Iowa 1982) (holding the question of "whether the sexual act was committed 'by force or against the will'

of the victim should be decided by considering the circumstances surrounding the act. This, we take it, means *all* the circumstances, subjective as well as objective").

The district court is "require[d] to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." *Alcala v. Marriott Int'l. Inc.*, 880 N.W.2d 699, 707 (Iowa 2016) (citation omitted). And we review refusals to give a requested jury instruction for correction of errors at law. *Id.* at 707–08. That said, it is "well-established law is that the district court 'is not required to give any particular form of an instruction; rather, the court must merely give instructions that fairly state the law as applied to the facts of the case.'" *State v. Davis*, 975 N.W.2d 1, 23 (Iowa 2022) (Appel, J., concurring in part and dissenting in part). Here, the district court opted for the State's version of the instruction as a correct statement of the law with consideration of the specific factual pattern developed at trial.

When a party claims a jury-instruction error, we begin by reviewing whether the instruction actually given correctly states the law. *See State v. Ellison*, 985 N.W.2d 473, 478 (Iowa 2023). And here, the challenged instruction essentially restates the language of Iowa Code section 709.5, "so its inclusion, without more, contains no misstatement of the law." *Id.* So, Sidney's challenge to the jury instruction fails.

**C. Weight of the Evidence.**

Sidney challenges the district court's denial of his motion for new trial regarding his claim the weight of the credible evidence does not support his

convictions on counts I and II.[6]  For both counts, the State had to prove Sidney engaged in a sex act with M.S. while she was under the age of sixteen and they were members of the same household who were not husband and wife.  For count I, the State also had to prove the sex act was contact between Sidney's penis or his mouth and M.S.'s vagina.  As for count II, the State had to prove sexual contact between Sidney's fingers and M.S.'s vagina.

It is unclear which of these elements Sidney claims is not supported by the appropriate weight of credible evidence.  Sidney raises questions about much of M.S.'s testimony that Sidney was physically aggressive toward her—both during sex acts and other times.  But Sidney is challenging the weight of the evidence on counts I and II, neither of which contain the "by force or against the will" element.  In addition, Sidney attempts to raise doubts about M.S.'s overall veracity—pointing out what he calls "inconsistencies" but what are generally just actions taken by M.S. that are different than those he apparently thinks a victim should take—after the district court explicitly found M.S.'s testimony credible, ruling:

> [Sidney] asserts that the State failed to provide sufficient evidence to prove [he] performed a specific sex act with M.S. while she was under the age of sixteen and that indicated that the sexual encounters between M.S. and him were inconsistent and not credible given her testimony based upon other evidence at trial.  [Sidney] really doesn't cite any specific instances of inconsistency but notes them in the argument.
>
> In contrast, though, in reviewing the testimony in this case, M.S. provided testimony that the Court believes was credible. Specifically, [M.S.] stated and testified that she moved in with the defendant in 2013 at the age of twelve or thirteen, and soon after moving in, while she was approximately thirteen years of age, [Sidney] began touching her in an inappropriate manner.
>
> This then progressed to full contact between [Sidney's] penis and her vagina, [his] mouth and her vagina.  She testified that there

---

[6] Counts III through V are not challenged.

> was contact between [Sidney's] penis and her vagina and [Sidney's] mouth and her vagina prior to them moving to Ankeny, which placed her at the age of approximately fifteen.
>
> While [Sidney] made statements that were in some ways different than this when he spoke for the officers, as the State purportedly notes, [Sidney] was not under oath at this time and was not subject to cross-examination.

And nothing Sidney argues on appeal convinces us the district court was wrong about M.S.'s credibility. So, we cannot say the district court abused its discretion in denying Sidney's motion for new trial. *See State v. Jackson Thomas*, 987 N.W.2d 455, 464 (Iowa Ct. App. 2022) (reiterating that our review is for whether the district court abused its discretion in denying the motion for new trial).

**III. Conclusion.**

We do not reach the merits of Sidney's claims about the court declaring a mistrial, we find no error in the challenged jury instruction, and the district court did not abuse its discretion in denying Sidney's motion for new trial. We affirm.

**AFFIRMED.**