# IN THE COURT OF APPEALS OF IOWA

No. 24-1205
Filed September 17, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ZACHARY ALAN KIRBY,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Boone County, Ashley Beisch, Judge.

A defendant appeals convictions for two counts of assault on persons of certain occupations, arguing there was insufficient evidence to support the convictions. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Richard Bennett, Special Counsel, for appellee.

Considered without oral argument by Schumacher, P.J., and Badding and Langholz, JJ.

**SCHUMACHER, Presiding Judge.**

Zachary Kirby appeals two convictions for assault on persons in certain occupations in violation of Iowa Code section 708.3A(4) (2024), following jury trial. The district court sentenced Kirby to ninety days in jail for each conviction, the sentences to run concurrently, with all but two days suspended, and placed him on probation for one year. Kirby argues there was insufficient evidence to show he possessed specific intent to commit the assaults based on his intoxication defense. Upon our review, we affirm the convictions.

I.      **Background Facts and Proceedings**

The Boone Police Department received a call around midnight from a concerned citizen stating there was a man asleep in a parking lot behind a bar in Boone, Iowa. The caller said the person sleeping might be a resident of the apartment located above the bar. The responding officer was aware of the identity of the resident of the apartment, whom he referred to as "Josh," and who was "prone to overdosing on fentanyl." Based on this background information, the officer requested emergency medical personnel report to the scene. When the responding officer arrived at the scene, a patron of the bar came outside and indicated the area where the man could be found. The man was later identified as Zachary Kirby.

The officer located Kirby, who by this time was standing and conscious, leaning against a parked car. The officer later testified that it appeared Kirby had vomited and that the officer believed that Kirby was under the influence of either drugs or alcohol. Three other officers arrived shortly to assist along with medical personnel. Many of these responders testified that Kirby was not in control of his

motor functions at this point and was incoherent. The responders determined, based on Kirby's level of intoxication, that he should be transported to the local hospital to be medically cleared prior to taking him to jail for public intoxication. Kirby was transported to Boone County Hospital via ambulance.

While at the hospital, although Kirby had been responding to the name "Josh," he informed the medical staff of his true name and his date of birth. He was treated by an emergency department nurse, T.L., and a technician, A.K. They were both wearing identifying hospital badges and scrubs. T.L. testified that Kirby appeared to be in control of his motor functions when he arrived and after a sternum rub, but T.L. "could not understand half of what he said" either because of his intoxication or the slang he was using.

A.K. testified, contrarily, that initially Kirby was not in control of his motor functions and was not responsive to questioning. But A.K. also testified that as time went on Kirby's condition improved and he became more alert, sitting up and talking. T.L. also testified that Kirby was wet when he arrived at the hospital, and she surmised he had urinated on himself.

Standard protocol required that Kirby's clothes be removed so he could change into a hospital gown. While T.L. and other staff began to remove his clothing, Kirby grabbed one of her breasts. The staff told Kirby "Hey, don't do that." T.L. testified that during this first incident, Kirby was talking, his eyes were open, and he was interactive. She also stated that the touching was intentional, more than a brush or incidental touch. After this initial grab, Kirby laughed.

Once Kirby was in a hospital gown, the other staff left the room, leaving T.L. alone with Kirby. While T.L. was checking Kirby's blood pressure, he grabbed her

breast for a second time. T.L. admonished him not to do that, and Kirby laughed again. And then, while T.L. was attempting to perform other duties for Kirby, he grabbed her breast a third time. T.L. again told him not to do that, and Kirby again laughed while laying back down.

After the third grab, T.L. exited the room and informed a police officer of what had happened. The next day, she went to the police station to formally report the incidents.

The hospital technician, A.K., testified that Kirby was more coherent and had further control of his motor functions as he was about to be discharged. He was able to respond to questions and able to sit up on his own. A.K. testified, "He became more alert and oriented."

As Kirby prepared to be discharged from the hospital, A.K. assisted by supporting him so he could sit at the edge of the bed. A.K. testified she was standing by his side when Kirby began to flail his arms and then punched A.K. in the abdomen, stating, "I'm not going." T.L. witnessed this happening. A.K. testified that at the time of the punch, she could understand his speech clearly.

None of the officers witnessed this incident, but they entered the room after hearing a commotion. When one officer entered the room, the officer heard Kirby say, "a comment to the type of, okay, okay, I'll be civil." Another officer testified that Kirby's condition seemed improved since arriving at the hospital. He was able to walk out of the hospital with minimal assistance, had better control of his motor functions, and could speak and respond to questions.

Kirby was able to walk into the jail on his own. An officer testified that Kirby was "still obviously impaired" but was able to better control his motor functions. At

the jail, the same officer read a form which notified Kirby of his right to call an attorney or a family member. When Kirby signed the document, he made loops at the end of his signature continuously until the officer took it away. The officer also told Kirby of his right to decline or request a breath test. The officer testified at trial that she was not certain Kirby understood what she was telling him. Kirby informed the officers many times he was going to take a "smiley face test." Kirby eventually declined the breath test and signed a document reflecting that decision. The officer had to indicate to Kirby where to sign.

After Kirby bonded out of jail, an officer went to Kirby's home to speak with him about T.L.'s report. Kirby told the officer he could not remember what had happened as he was extremely drunk and stated "[t]hat he should have had a male nurse." Neither law enforcement nor the hospital obtained a sample of Kirby's blood, breath, or urine on the night of Kirby's arrest.

At trial, Kirby testified in his own defense. He stated on the night of the incident, he went to a friend's house around 7:00 p.m., where he drank three-fourths of a bottle of wine and two-thirds of a "handle" of Fireball whiskey. The last thing he remembered was going outside to meet a friend around 9:30 p.m. He testified that he did not remember anything else from that night; his memory came back as he woke up in jail at 10:00 or 10:30 a.m. He performed a breath test that morning in the jail which showed a blood alcohol content of 0.15 percent. Kirby testified he was still drunk at his initial appearance and had to wait an additional three or four hours to sober up before the jail would release him.

Kirby was convicted after a jury trial of two counts of assault on persons in certain occupations. He appeals.

## II.    Standard of Review

We review sufficiency of the evidence challenges for correction of errors at law.  *State v. Hearn*, 797 N.W.2d 577, 579 (Iowa 2011).  "The district court's findings of guilt are binding on appeal if supported by substantial evidence. Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt."  *Id.* at 579–80 (citation omitted).  In determining whether substantial evidence exists to support a verdict, "we consider all the evidence and the record in the light most favorable to the trial court's decision."  *Id.* at 580.  "We draw all legitimate inferences in support of the verdict.  However, 'evidence which merely raises suspicion, speculation, or conjecture is insufficient.'" *Id.* (internal citation omitted) (quoting *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992)).

## III.    Discussion

Kirby asserts that the State did not produce sufficient evidence that he possessed specific intent to assault the healthcare providers because of his voluntary intoxication.  The jury was instructed the State had to prove the following elements of assault on persons in certain occupations[1]:

> 1. On or about February 13, 2024, in Boone County, Iowa, Zachary Kirby did an act which was specifically intended to cause pain or injury, result in physical contact which was insulting or offensive, or place [A.K.] in fear of immediate physical contact which would have been painful, injurious or offensive to her.
> 2. Zachary Kirby had the apparent ability to do the act.
> 3. [A.K.] was a healthcare provider and Zachary Kirby knew she was a healthcare provider at the time of the act.

---

[1] An identical jury instruction was provided for the other charge against Kirby, except it referenced T.L. instead of A.K.

The jury was also instructed:

> Zachary Kirby claims he was under the influence of alcohol at the time of the alleged crime. The fact that a person is under the influence of alcohol does not excuse nor aggravate his guilt.
>
> Even if a person is under the influence of alcohol, he is responsible for his act if he had sufficient mental capacity to form the specific intent necessary to the crime charged or had the specific intent before he fell under the influence of alcohol and then committed the act. Intoxication is a defense only when it causes a mental disability which makes the person incapable of forming the specific intent.

Although the Iowa Code states assault is a general intent crime, our courts have determined it contains "a specific intent component" and have "declared it a specific-intent crime." *State v. Bensen*, 919 N.W.2d 237, 245 (Iowa 2018) (cleaned up); *see* Iowa Code § 708.1.

Under Iowa law, voluntary intoxication may be relevant to determine whether a defendant was able to form specific intent when required for a charged crime. *See* Iowa Code § 701.5; *State v. Davis*, No. 23-0794, 2024 WL 4039570, at *6 (Iowa Ct. App. Sept. 4, 2024). While not considered a "defense," voluntary intoxication "is simply evidence to be considered by the jury on the issue of intent." *State v. Collins*, 305 N.W.2d 434, 437 (Iowa 1981).

Vountary intoxication does not add an element of a crime which the State must prove but is merely a consideration which bears on "whether the State has met its burden to prove [an] element involved beyond a reasonable doubt." *State v. Templeton*, 258 N.W.2d 380, 383 (Iowa 1977); *see also State v. Starr*, No. 22-0277, 2023 WL 5092065, at *1 (Iowa Ct. App. Aug. 9, 2023). Voluntary intoxication may consequently demonstrate a defendant was unable to form specific intent to commit a crime or may negate specific intent. *State v. Guerrero Cordero*, 861

N.W.2d 253, 258–59 (Iowa 2015), *overruled on other grounds by Alcala v. Marriott Intern., Inc.*, 880 N.W.2d 699, 708 (Iowa 2016). Proof that intoxication negated specific intent required for a crime does not excuse that crime, as the defendant can be found guilty of a lesser-included offense which does not require specific intent. *Id.* at 259.

Iowa courts have held that a high level of intoxication is required to negate specific intent. *Id.* at 259; *State v. Sudbeck*, No. 15-0596, 2016 WL 3003407, at *4 (Iowa Ct. App. May 25, 2016). The intoxication "must be to the extent that the designing or framing of such purpose is impossible." *Guerrero Cordero*, 861 N.W.2d at 259 (citation omitted). Evidence of intoxication in of itself does not sustain a finding of a lack of specific intent. *Id.* at 261; *State v. Clark*, No. 14-2035, 2016 WL 1130286, at *3 (Iowa Ct. App. Mar. 23, 2016).

Here, it is undisputed that Kirby was heavily intoxicated when law enforcement first made contact with him. He could not stand without leaning on a car or without assistance. It appeared to the first responding officer that Kirby was recovering from vomiting and he had urinated himself. Bodycam footage showed Kirby was incoherent and continually responded to the wrong name. Kirby testified at trial that he drank two-thirds of a handle of whiskey and three-fourths of a bottle of wine within two and a half hours.

But, after he arrived at the hospital, T.L. testified that Kirby seemed to be in control of his motor functions after waking him with a sternum rub. Although A.K. testified she did not think Kirby was in control of his motor functions initially, she did state that it appeared Kirby was improving during treatment. He also was able to identify himself and provide his date of birth to hospital staff.

By the time of the first incident with T.L., Kirby appeared to have control of his arms and hands, his eyes were open, and he was talking. He reached out to T.L. and grabbed her breast, and she testified it was a "grab" not a "brush." Kirby laughed in response to T.L.'s request he not repeat the behavior and laughed twice more after each grabbing of T.L.'s breast. A rational fact finder could conclude this behavior was indicative of Kirby being aware of and intending his actions.

When confronted with these actions later when a police officer arrived at his home, Kirby stated "[t]hat he should have gotten a male nurse." Considering the repetition of the actions, his responses, and the deliberate nature of his actions, there was substantial evidence to support a finding Kirby acted with specific intent to assault T.L. Additionally, the jury was able to review video footage of law enforcement's initial contact with Kirby, and footage when he left the hospital. Viewing the evidence in a light most favorable to the State, we affirm the first conviction of assault on persons in certain occupations.

Turning to the assault against A.K., there was also substantial evidence to convince a rational jury that Kirby intended to commit the assault. A.K. testified that Kirby's condition continually improved in the hospital, he was in control of his motor functions and was becoming more alert. A.K. also testified that prior to Kirby punching her with a closed fist, he stated, "I'm not going." After punching A.K., police entered the room and Kirby stated he would "be civil."

The evidence indicates that Kirby was aware he was about to be taken to jail, and a jury could reasonably conclude that the assault was an intentional act to prevent his transport. Kirby's response that he would "be civil" after confronted by officers implies he was aware of his actions and knew they were wrong.

Considering T.L. and A.K.'s testimony concerning Kirby's improving condition at the hospital and his statements before and after the assault, we find there was substantial evidence to support the jury's verdict on this conviction of assault on persons in certain occupations.  *See id.* at 579–80.

**IV.     Conclusion**

We conclude there was substantial evidence to support the convictions.  We affirm both of Kirby's convictions for assault on persons in certain occupations.

**AFFIRMED.**