**IN THE COURT OF APPEALS OF IOWA**

No. 19-0082
Filed February 5, 2020

**STATE OF IOWA,**
 Plaintiff-Appellee,

**vs.**

**LHA SOUTHIDETH-WHITEN,**
 Defendant-Appellant.
_____

 Appeal from the Iowa District Court for Lee (North) County, John M. Wright,

Judge.

 Lha Southideth-Whiten appeals his conviction for voluntary manslaughter.

**AFFIRMED.**

 Martha J. Lucey, State Appellate Defender, and Ashley Stewart, Assistant

Appellate Defender, for appellant.

 Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant

Attorney General, for appellee.

 Considered by Bower, C.J., and May and Greer, JJ.

**BOWER, Chief Judge.**

Lha Southideth-Whiten appeals his conviction for voluntary manslaughter, in violation of Iowa Code sections 707.4 (2016). Southideth-Whiten contends the trial court abused its discretion in excluding expert testimony concerning his justification defense and erred in instructing the jury that a person is not justified in using reasonable force if an alternative course of action is available. Finding no abuse of discretion or error in the jury instructions, we affirm.

**I. Background Facts and Proceedings.**

On October 20, 2016, Southideth-Whiten and Michael Whitworth were both inmates working in the Iowa Prison Industries building at the Iowa State Penitentiary. During a lunch break, both Southideth-Whiten and Whitworth were in line to enter the cafeteria. There was one correctional officer in the cafeteria. Two cameras captured video of the ensuing incident. Southideth-Whiten and Whitworth began talking to each other. Whitworth then threw punches at Southideth-Whiten. Southideth-Whiten punched Whitworth, who fell to the floor. Southideth-Whiten got on top of Whitworth and hit him repeatedly until Whitworth was bloody and not moving. Southideth-Whiten stepped away for a moment, wiped his face, and then returned to Whitworth, who was lying still on the floor, and backhanded him twice more across the face.

Whitworth was transferred to a local hospital and then air-lifted to the University of Iowa hospital, where he died ten days later.

Southideth-Whiten was charged with second-degree murder. He filed a notice of the affirmative defense of justification. At trial, the defense informed the court it intended to call an expert witness to address his justification defense.

The State filed a motion in limine, seeking to exclude certain opinion testimony. The trial court ruled:

> [Southideth-Whiten] intends to call Dr. Lori Sexton, an associate professor of criminal justice and criminology at the University of Missouri Kansas City, to testify concerning the prison environment in which [Southideth-Whiten] and the decedent lived. In her opinion, the prison environment is unique compared to the environment outside the walls. She was asked to study whether the prison environment affected [Southideth-Whiten]'s decisions on October 20, 2016, when he encountered the decedent.
>
> The [State] has no objection to Dr. Sexton testifying about the general environment within the prison walls. The [State] does object to this witness expressing opinions regarding whether [Southideth-Whiten] was justified in his actions.
>
> A motion brought pursuant to [Iowa] Rule [of Evidence] 5.104(a) requires the court to rule on the admissibility of evidence before it is presented in a trial. In this case, the [State] asks the court to determine whether Dr. Sexton is permitted to opine on the issue of justification. As the [State] points out, Dr. Sexton is not basing her opinion on the legal standard, rather she uses her extensive research to conclude [Southideth-Whiten] was justified in his actions against the decedent. This, the [State] argues, is improper.
>
> The court concludes that Dr. Sexton shall be allowed to testify concerning her area of expertise. She may illustrate for the jury the unique environment existing inside the prison walls. However, the court also concludes that Dr. Sexton shall not be allowed to testify that [Southideth-Whiten] was justified in his actions against the decedent. Furthermore, she shall not be allowed to testify whether his actions were reasonable based upon the circumstances present on October 20, 2016.

The case proceeded to a jury trial. Investigator Randy Van Wye testified Southideth-Whiten told him that Whitworth thought Southideth-Whiten had bumped into him while entering the cafeteria and Whitworth took issue. Southideth-Whiten stated he apologized to Whitworth. Investigator Van Wye stated that other inmates in the room offered no information on the altercation. Investigator Van Wye also testified that the policy of the prison with respect to an inmate fight is that if more than one correctional officer is present, staff is allowed

to intervene. However, if there was only one correctional officer present, that officer is to call for assistance. He testified Correctional Officer Mark Lair was the only staff in the cafeteria when this altercation happened.

Officer Lair testified he was on duty at the cafeteria entrance on October 20, checking inmates in to lunch. He heard a scuffle and looked up to see Southideth-Whiten and Whitworth struggling. Officer Lair told them to break it up, to no avail. He then sprayed Southideth-Whiten with pepper spray. Southideth-Whiten got off Whitworth, stepped away, and wiped his face. He then came back and struck Whitworth again.

The medical examiner testified Whitworth had bruising around both eyes, his nose, both sides of the face, the skin around the mouth and inside the mouth, and the back of his head. His skull was fractured near the right temple area and there was a large contusion on the back of the scalp. His brain was swollen. All injuries were "related to blunt force trauma of the head affecting the brain" and were significant enough to cause Whitworth's death. The medical examiner ruled the death a homicide.

About thirty minutes after the encounter, Southideth-Whiten spoke with Investigative Sergeant John Hawk, stating he had to "fight for his life" and that "he could have been killed." Sergeant Hawk testified Southideth-Whiten appeared "very wound up." He escorted Southideth-Whiten to the health care unit, where Sergeant Hawk noted Southideth-Whiten had a swollen and bloody nose, his knuckles were bruised, and he had a small cut on his right, pinky-finger knuckle. Hawk took pictures of Southideth-Whiten's hands and face. Those pictures show blood on both hands and blood spatters on his forehead.

Correctional Officer John Martinez responded to Officer Lair's call for assistance, entered the cafeteria, and placed handcuffs on Southideth-Whiten. Officer Martinez testified that inmates working in the prison industries factory have access to tools while working and there is a tool count at the end of each day. However, inmates are not searched before entering the cafeteria. Officer Martinez was not aware of any tool being found in the cafeteria after the altercation or that a tool was missing at the end of the day.

The defense asserted Southideth-Whiten was struck by Whitworth without provocation. They were in a room with a number of other inmates, all of whom had access to tools from the factory, and no assistance was forthcoming from the sole officer in the cafeteria. The defense argued Southideth-Whiten deserved protection but received none, and, therefore, he had no alternative course of action but to defend himself.

Dr. Sexton testified quite extensively about her research with prison populations. She testified she conducts research involving "first person accounts from prisoners, prison staff, and prison administrators to determine the objective context of prison, what the environment is like, and also how the people in that environment experience it." She stated a major theme arising from her research is "the importance of violence to the context"; that "there's an expectation that violence will be used to solve certain problems and a real fear of being subjected to violence, even when someone is minding their business." She also testified there was a general "fear of violence, fear for one's safety" both in the inmate population and prison staff.

Dr. Sexton also testified:

The lack of physical staff presence or just the knowledge that a facility is understaffed can really heighten this sense that the only way to handle an incident is to do it yourself.

So if someone comes at you, then there is less of an expectation that there's going to be an officer there at the ready to intervene, particularly if there's only one officer in the room or in your line of sight, then the expectation really is that officer isn't going to intervene because they have no backup.

So the culture of fear and the culture of violence and the lack of autonomy all combine with understaffing or minimal staff presence to basically provide people with very little option to resolve conflict.

She discussed the heightened awareness that might occur in an area of the prison

"where things that could easily be used as weapons are used instead as everyday

objects, like box cutters or awls or some kind of tool."

Dr. Sexton's testimony included inmates' responses to violent interactions:

A. So I've talked to inmates about everything from kind of minor scuffles with a cellmate that they're actually friends with but it turned violent and then was resolved—not really resolved, kind of papered over. Anything from that to instances in which someone was attacked unprovoked in a common area of the prison like the yard or the dining hall in the presence of officers and feared for their lives because the attack came out of nowhere and no one, inmates or officers, you know, was rushing to help them.

Q. . . . You mentioned a situation of an unprovoked attack. Is it unusual within the culture and violence that you've described, and based on your research, that the initial attack versus the response might not be equal? A. It's not unusual, no.

Q. Okay. So has your research given you any information as to why that may be? A. Absolutely. So one of the things that I've heard from a lot of people who have been involved in violent incidents that went farther than they expected was this idea that because they were in fear for their life or fear for, you know, grave harm to themselves, and because violence is such a key part of the prison culture, that once they're involved in a violent incident there really isn't the option to stop or de-escalate. It's essentially a choice, as it has been described to me, to either keep going so that you are certainly the victor or to lose the fight and end up being harmed quite seriously.

. . . .

Q. Okay. And based on your research, have there been situations where you've uncovered in some of these prisons where people have appeared to be . . . sort of out of the fight or disengaged and then only to find they would be attacked later? A. Yes. That's a very frequent but still surprising thing that I've heard from a lot of inmates, this idea that even when you think that you've successfully eliminated the threat, that someone is down for the count and isn't going to come back at you swinging or come back at you with a weapon of some type, that then they maybe turn and walk away and that person pops right back up as though reanimated. I mean, I've heard this story many times over. I've even heard it from correctional officers and from at least one administrator who report having seen the same thing, a fight between two inmates where it looked like one person was out of the fight, unconscious, on the ground, and then that person entered the fight and sometimes ended up winning it.

Defense counsel then asked:

Would someone who is aware of the fact that there is either understaffing or limited supervision in an area, and knowing that they are unarmed but being uncertain of the other person's status, based on your research through all of the different persons that you visited and studied, does that impact responses from the unarmed person if they're attacked?

The State objected and a discussion was held outside the presence of the jury. The prosecutor noted the question attempted to be phrased as a hypothetical but "really tracks the facts of this case" and sought an improper opinion as to the defendant's guilt or innocence. The defense argued the question was seeking general information only. The court sustained the objection. Dr. Sexton's testimony continued, but she was not allowed to opine Southideth-Whiten's response was reasonable or justified under the circumstances.

The court provided proposed jury instructions. The defense objected to the court's instructions concerning justification because they included language that a person is not justified in using force to defend themselves if an alternative course of action was available. The defense urged the court to note the exception to the

duty to seek an alternative course of action when a person is "in his own home."

Defense counsel argued Southideth-Whiten was in his home and where he was required to be and the instruction should mention the "home exception" to the duty to seek an alternative course of action. The court overruled the objection.

The jury instructions included the following:

## INSTRUCTION NO. 16

The defendant claims he acted with justification. A person may use reasonable force to prevent injury to a person, including the defendant. The use of this force is known as justification.

Reasonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent injury.

A person can use deadly force against another if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.

The State must prove the defendant was not acting with justification.

## INSTRUCTION NO. 17

A person is justified in using reasonable force if he reasonably believes the force is necessary to defend himself from any imminent use of unlawful force.

If the State has proved any one of the following elements, the defendant was not justified:

(1) The defendant started or continued the incident which resulted in death.

(2) An alternative course of action was available to the defendant.

(3) The defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.

(4) The defendant did not have reasonable grounds for the belief.

(5) The force used by the defendant was unreasonable.

## INSTRUCTION NO. 18

The defendant was not required to act with perfect judgment. However, he was required to act with the care and caution a reasonable person would have used under the circumstances which existed at that time.

If in the defendant's mind the danger was actual, real, imminent or unavoidable, even though it did not exist, that is sufficient if a reasonable person would have seen it in the same light.

## INSTRUCTION NO. 19

The defendant claims danger existed. You are to consider the danger or apparent danger from the viewpoint of a reasonable person under the circumstances which existed at that time.

It is not necessary that there was actual danger, but the defendant must have acted in an honest and sincere belief that the danger actually existed.

Apparent danger with knowledge that no real danger existed is no excuse for using force.

## INSTRUCTION NO. 20

If a defendant is confronted with the use of unlawful force against him, he is required to avoid the confrontation by seeking an alternative course of action before he is justified in repelling the force used against him.

## INSTRUCTION NO. 22

A person is not justified when he provokes or causes force to be used against him, intending to use it as an excuse to injure another.

If you find the State has proved the defendant provoked the use of force intending to use it as an excuse to injure Michael Whitworth, he was not justified.

## INSTRUCTION NO. 23

A person is not justified when he provokes or causes force to be used against him, intending to use it as an excuse to injure another.

If you find the State has proved the defendant provoked the use of force intending to use it as an excuse to injure Michael Whitworth, he was not justified.

However, there is an exception if the defendant provoked the use of force, if Michael Whitworth used force greatly disproportionate to the provocation and it was so great that the defendant reasonably believed he was in imminent danger of death or injury, he is not considered to have provoked the incident and his acts would be justified.

## INSTRUCTION NO. 27

The State must prove all of the following elements of the lesser-included offense of voluntary manslaughter:

(1) On or about October 20, 2016, the defendant struck Michael Whitworth.

(2) Michael Whitworth died as a result of being struck.

(3) The striking was done solely by reason of sudden, violent and irresistible passion resulting from serious provocation.
(4)The defendant was not acting with justification.

Southideth-Whiten was found guilty of the lesser-included offense of voluntary manslaughter.  He now appeals, asserting the court's limits on the expert's testimony was an abuse of discretion and its failure to provide additional language in the justification jury instructions was in error.

## II. Scope and Standard of Review.

"The admissibility of expert testimony in a criminal case 'falls squarely within the trial court's sound discretion.'"  *State v. Edouard*, 854 N.W.2d 421, 436 (Iowa 2014) (citation omitted), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016); *see also In re Det. of Palmer*, 691 N.W.2d 413, 416 (Iowa 2005), *overruled on other grounds by Alcala*, 880 N.W.2d at 708 n.3.  "An abuse of discretion occurs when the trial court 'exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable.'"  *State v. Reyes*, 744 N.W.2d 95, 99 (Iowa 2008) (citation omitted).

Absent a discretionary component, we review challenges to jury instructions for correction of errors at law.  *Alcala*, 880 N.W.2d at 707 ("Iowa law requires a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions.").  "We evaluate whether the instruction at issue 'accurately states the law and whether substantial evidence supports it.'  Even when the instruction is erroneous, we will not reverse unless prejudice resulted.  'Prejudice results when jury instructions mislead the jury or materially misstate the law.'"  *State v. Mathias*, 936 N.W.2d 222, 226 (Iowa 2019) (citations omitted).

**III. Discussion.**

    ***A. Expert testimony.*** On appeal, Southideth-Whiten argues Dr. Sexton "was barred from providing testimony concerning how inmates' reaction to violence in prison might be reasonably different from violence encountered outside prison walls." Having reviewed the testimony, we cannot agree with this characterization of the expert witness's testimony, which we set out in some detail above.

    It is true the court ruled Dr. Sexton could not testify Southideth-Whiten was justified in his actions or whether his actions were reasonable based upon the circumstances. This ruling is in keeping with the cases relied on by Southideth-Whiten as support for his contentions. In *State v. Olsen*, our supreme court held:

> [W]hile a witness may not testify whether marijuana is held for personal use, he may testify on the pattern or modus operandi of a certain offense and compare the facts of the case to it. The distinction is that, on the one hand, the witness is asked for an opinion based upon certain evidence as it relates to a well-defined modus operandi and on the other, an opinion on the guilt or innocence of the defendant. The former is proper; the latter is not. We have said this line of distinction, while fine, is nevertheless essential.

315 N.W.2d 1, 6–7 (Iowa 1982) (citations omitted).

    Yet, Dr. Sexton was allowed to testify at length about the prevalence of violence in prison, the generalized sense of fear and danger an inmate faces, and about inmates' reactions to violence in the prison setting, which might seem disproportionate in other settings. Thus, the defense expert provided the jury with helpful information to determine whether Southideth-Whiten's actions constituted "reasonable force . . . he reasonably believes . . . is necessary to defend himself

from any imminent use of unlawful force"—as they were instructed. The cases cited by the defense do not convince us otherwise.[1]

As noted in *Dinkins*, Iowa Rule of Evidence 5.704 provides: "An opinion is not objectionable just because it embraces an ultimate issue." *See* 553 N.W.2d at 341. Nevertheless, expert testimony is allowed "if the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702.

> Thus, a witness cannot opine on a legal conclusion or whether the facts of the case meet a given legal standard. Such an opinion would be of no value to the jury. In most cases, the jurors are fully capable of applying the facts of the case to the law provided to them by the trial judge.

*Palmer*, 691 N.W.2d at 419 (internal citation omitted). Here, the jury was capable of applying the facts of the case to the law provided to them by the trial judge. *See Edouard*, 854 N.W.2d 436–37 ("Even if the theological community were in agreement that Edouard's actions did not amount to pastoral counseling, that would not resolve whether Edouard's actions fit within the statutory definition of mental health services. . . . The specialized meaning given to a term by the

---

[1] The defense also cites to *State v. Dinkins*, 553 N.W.2d 339, 341 (Iowa Ct. App. 1996). In *Dinkins*, the court wrote:
> Expert testimony consisting of scientific, technical or other specialized knowledge is admissible at trial when it is helpful for the trier of fact to understand the evidence in the case or to determine a fact in issue, as long as its probative value is not substantially outweighed by the danger of unfair prejudice. Such opinions may generally be expressed even though they embrace "an ultimate issue to be decided by the trier of fact." *These basic precepts, however, do not permit a witness to express a direct opinion on the guilt or innocence of the defendant.* Determining guilt or innocence is the exclusive function of the finder of fact; and consequently, is an improper subject of expert testimony.
553 N.W.2d at 341 (emphasis added) (internal citations omitted).

theological community is ultimately beside the point in determining whether Edouard's actions met the legislature's definition of the crime. . . . Hence, the district court did not abuse its discretion in excluding Dr. Wakefield's proposed testimony."). We find no abuse of the trial court's discretion concerning the expert witness's testimony.[2]

**B. Jury instructions.** Southideth-Whiten also contends the trial court erred in refusing to include the "home exception" language to Instruction No. 20. Uniform Jury Instruction 400.10 offers this language concerning the home exception:

> If the defendant was in [his] [own home] . . . which [he] was legally occupying and the alternative course of action was such that [he] reasonably believed [he] had to retreat or leave [his] position to avoid the confrontation, [he] was not required to do so and [he] could repel force with reasonable force (including deadly force).

Southideth-Whiten argues a prison should be considered an inmate's home for purposes of the duty to take an alternative course of action.[3]

Our supreme court has recently addressed the statutory duty to follow an alternative course of action in *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 869 (Iowa 2019). The court noted, "Justification is a statutory defense that permits a defendant to use reasonable force to defend himself or herself." *Id.* In Iowa Code section 704.1, the legislature defines reasonable force:[4]

---

[2] Because we have addressed the merits of the issue, we do not address the alternative claim based on ineffective assistance of counsel.

[3] Dr. Sexton also testified that the prison was the inmates' home, "[i]t is where inmates live, where they eat, where they sleep, and where they work."

[4] In 2017, the Iowa legislature deleted the alternative-course-of-action language and added the stand-your-ground provision: "A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as specified in this chapter." 2017 Iowa Acts. ch. 69, § 37 (codified at Iowa Code § 704.1(3) (2018)). The amendment took effect July 1, 2017, subsequent to the events here and, thus, is not applicable.

> Reasonable force, including deadly force, may be used even if an alternative course of action is available if the alternative entails a risk to life or safety, or the life or safety of a third party, or requires one to abandon or retreat from one's dwelling or place of business or employment.

*See also Lorenzo Baltazar*, 935 N.W.2d at 869. The supreme court noted the statutory provision recognizes that the "implied duty to follow an alternative course of action [is] a disqualifying factor for justification." *Id.*

Southideth-Whiten has cited no Iowa case that would support a requirement that the district court instruct the jury a prison cafeteria is an inmate's dwelling for purposes of the duty to retreat. He does note an Ohio case that recognized an inmate in a locked prison cell could not seek an alternative course of action from a cell mate. *State v. Cassano*, 772 N.E.2d 81, 97 (Ohio 2002).

Even granted that "retreat was impossible under [such] circumstances," nothing in the statutory provision leads us to believe the legislature intended the "home exception" to encompass the cafeteria within a maximum security prison. As such, we conclude the district court did not err in refusing to instruct the jury as requested. We affirm.

**AFFIRMED.**

---

We note, however, the supreme court ruled the "duty to retreat remains if the activity is illegal or the presence unlawful." *Lorenzo Baltazar*, 935 N.W.2d at 870.