# IN THE COURT OF APPEALS OF IOWA

No. 19-0453
Filed December 16, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ETHAN L. DAVIS,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Appanoose County, Myron L. Gookin, Judge.

The defendant appeals from his conviction for murder in the first degree.

**AFFIRMED AND REMANDED FOR ENTRY OF NUNC PRO TUNC ORDER.**

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Ethan L. Davis, Fort Madison, self-represented.

Heard by Bower, C.J., and Vaitheswaran and Greer, JJ.

**GREER, Judge.**

Ethan Davis appeals from his conviction and sentence for murder in the first degree. Davis argues (1) there is insufficient evidence to establish his identity as the perpetrator of the killing; (2) the court was wrong to deny his request for a specific jury instruction on reasonable doubt; (3) the court was wrong to prohibit defense counsel from using "hesitate to act" language to describe reasonable doubt during the defense's closing argument; (4) the court was wrong to urge the jury to reach a verdict after being told it was deadlocked rather than simply telling the jury to reread the jury instructions already given; (5) the court allowed the State to impermissibly shift the burden of proof to Davis; and (6) a nunc pro tunc order is needed to make the court's written sentencing order conform with its oral statements at sentencing.[1]

**I. Background Facts and Proceedings.**

Curtis Ross visited southern Iowa to go deer hunting for a few days following Thanksgiving in November 2017. Ross was staying at the home of his friend, Tyler

---

[1] Davis also filed a pro se supplemental brief on appeal. In this appellate brief, he lists a number of purported issues, but he does not cite to the record or rely on any legal authority. Additionally, these issues were generally not raised to the trial court and several are outside the scope of the record before us (such as conversations Davis claims to have had with his attorney or things he saw on social media that were never introduced at trial). Without more-developed arguments, citations to the record, explanation of how these arguments have been preserved for our review, or reliance on any legal authority, we cannot consider these claims. *See In re Estate of DeTar*, 572 N.W.2d 178, 180 (Iowa Ct. App. 1997) ("Iowa law dictates that [a pro se appellant's] brief is judged by the same standard as a brief filed by an Iowa lawyer. The law does not judge by two standards, one of lawyers and another for non-lawyers. . . . The Iowa Rules of Appellate Procedure govern the form and manner for briefs filed in the supreme court. Substantial departures from appellate procedures cannot be permitted on the basis that a non-lawyer is handling [their] own appeal." (citations omitted)).

Jensen, but the two men were hunting in separate areas. Ross chose to hunt on public land near Rathbun Lake. Jensen saw Ross around noon on Friday, November 24, as Ross left Jensen's home for a second stint of hunting that day.

A little before 1:30 p.m., using Snapchat, Ross sent a picture of his hunting gear to his friend, Donna. The Snap also included text, which said, "It's going to be a long walk outta here." Still using Snapchat, Donna responded with a picture at 1:27 p.m., which was viewed on Ross's phone at 1:38 p.m. Beginning at 1:59 p.m., Ross received sixteen Snaps that he never opened. It was later determined his cell phone last received a signal at 3:31 p.m. that day.

Jensen tried to reach Ross by text message around 3:30 p.m. and through Snapchat at approximately 3:50 p.m. Ross did not respond to either message, which Jensen noted was unusual for him. By 11:30 p.m., when Ross had not yet returned to Jensen's home for the night and was not responding to Jensen's attempts to make contact with him, Jensen became concerned. He left his home in his vehicle and drove around to a few locations he thought Ross might be, including a local bar. When he did not find him, Jensen went to the public hunting ground to look for Ross. He found Ross's truck parked at the end of a dead-end road near where Ross had trail cameras and hunting stands set up. Jensen yelled for Ross a few times but with no result. He called the local police around 1:00 a.m. on Saturday, November 25.

Local police and conservation officers immediately began searching for Ross. Jensen joined them in their efforts. At approximately 8:00 a.m., Officer Cody Jellison found Ross's body in the water. The body was naked, and it was apparent Ross had been shot and stabbed.

Dr. Michelle Catellier, an associate medical examiner for the state of Iowa, conducted an autopsy. She identified ten entrance wounds from gunshots, twenty-six stab wounds, and five incise wounds on Ross's body. One of the gunshot wounds—one to Ross's face—showed stippling, which Dr. Catellier described as "little pinpoint abrasions" from "gunpowder particles, some burned and unburned, [that] smack against the skin." She noted the muzzle of the gun would have to be "close" for stippling to occur, estimating it was within "inches or as much as a couple feet" at the time the shot was fired. Dr. Catellier also noted that at least some of the stab wounds appeared to have taken place when Ross was still alive, based on her observation of blood inside the wounds. According to Dr. Catellier, Ross's cause of death was multiple gunshot wounds and stab or incised wounds.

Officers combed the area in the days following the discovery of Ross's body, looking for his missing clothing and hunting gear and any evidence regarding who killed him. By November 27, officers located four shell casings on top of a hill overlooking the water near where Ross's body was found. From that location on the hill down closer to the water, they found blood on the ground in multiple spots. The first spot, where there was a large area of blood, also included a "metal tip . . . consistent with what would come off of a military style .223 cartridge," what appeared to the criminalist to be bone fragments, and another fired shell casing. Officers also located three other areas of blood, including an area along a path towards the water, an area at the edge of the water where they opined Ross's body may have gone in, and an area in the water. Along with the blood, a patch of tall grass was matted down—as if Ross's body was dragged through it to get to the water. The blood was later determined to match Ross's DNA with the probability

of finding that profile in the population of unrelated individuals at random less than one in 630 septillion. Further away, officers found an ammunition can stashed in an old, rusted refrigerator by a path back to where Ross was found, and gun magazines—some loaded with ammunition—in a culvert. The ammunition can contained several different types of ammunition, but the loaded magazines held .223 rounds with green polymer tips.[2] Officers were aware that .223 and 5.56mm ammunition are typically used in an AR-15 rifle.

The ammunition can from the refrigerator and the magazines from the culvert were sent to the Iowa Division of Criminal Investigations (DCI) for fingerprint analysis. Both the magazines and the ammunition can were determined to have Davis's fingerprints on them. At this point, Davis became a suspect in Ross's killing.

Based on the fingerprint evidence and reports that Davis owned AR-15 rifles from Shayla Stevens, with whom Davis shares a child, officers obtained a search warrant for Davis's home. Davis was living with his parents on their 400-acre farm. The farmhouse was approximately 2.5 miles from where Ross's body was found. Davis had a camper parked on their land where he stayed when weather permitted. He also had two vehicles, a Hummer and a Dodge truck. During winter, he lived in his parents' home.

---

[2] According to testimony at trial, the .223 ammunition is "more or less the same" as 5.56 mm ammunition. There was testimony that one had originally been "military" ammunition as opposed to that sold to civilians and that the amount of gun powder in one caused it to burn hotter, but the two types of ammunition were generally discussed interchangeably during trial. It was noted the recovered AR-15 would fire both types of ammunition.

During the execution of the search warrant on November 28, officers found an AR-15 rifle under a hay mower parked on the Davis farm. According to records, Davis had purchased the gun in 2015. It was later tested and found to have Ross's blood and Davis's fingerprints on it. Additionally, the four shell casings found on the top of the hill, one shell casing found in Ross's blood, and another recovered shell casing were all determined to have been shot from the AR-15.

Davis was charged with first-degree murder. He entered a plea of not guilty, and an eight-day jury trial took place in February 2019.

At trial, based on a stipulation and testimony from witnesses, the jury learned Davis was involved in an incident a little before noon on Friday, November 24. Davis went into the home of Stevens's new boyfriend, "fired a round in the air [using a 9 mm he generally carried], grabbed his kid, and left." Stevens called 911 to report the incident at 11:42 a.m. According to Davis, he knew he was likely to be arrested and jailed for this, and he started driving around to various friends' and family members' homes to see if he could leave his child with them. Davis went to a few different places without finding anyone home before going to the home of his friend, Joseph. Joseph noted Davis parked behind his home, which was unusual. According to Joseph, Davis was "upset" and "worked [] up" when he came into the house and it was clear he had been crying. Davis was only there a couple minutes—long enough to put his child on the floor and write out his mother's phone number so Joseph could call her to come get the child. Davis was without his phones and had been since Wednesday evening, when he left them at this cousin's house. Joseph called Davis's mother, Tammy, at 1:05 p.m. on Friday— by which point Davis was already gone.

Davis was not seen or heard from again until approximately 5:00 p.m. on Saturday, November 25, when he went to his family home. Davis, whose phones were brought to the Davis home by his cousin on Friday, called his parents to tell them he was at the farmhouse. Both his mother and father returned shortly after, and they convinced him to turn himself in for the incident involving his child. He did so at approximately 9:00 p.m. on Saturday.[3]

According to Davis, he spent the time between when he was last seen by Joseph on Friday and approximately 5:00 p.m. on Saturday mostly in his Hummer, which he had parked in a remote area of the family farm to escape detection by police. He testified he sat in his vehicle listening to music and smoking until sometime after dark on Friday evening, when he walked to a nearby church and spent some time there. He slept in the Hummer overnight. Saturday morning, he walked back to the farmhouse, grabbed some food, and returned to the Hummer—without alerting his parents. He remained in the field with his vehicle until Saturday evening, when he walked to the farmhouse again and, for the first time, alerted his parents where he was. Davis admitted he owned the AR-15 rifle, ammunition can, gun magazines, and some other items later recovered outside the Davis farm (a backpack, a bullet proof vest, a firearm case, and another ammunition can). He testified he kept these items in the back of his Hummer and had last seen them there approximately four to six weeks earlier. He indicated he did not know they were missing from his vehicle but testified they must have been taken without his

---

[3] At his trial for first-degree murder, Davis stipulated that he was charged with burglary in the first degree, willful injury causing bodily injury, and assault causing bodily injury and was convicted of assault causing bodily injury for his actions when he entered Stevens's boyfriend's home.

knowledge. Police confirmed that when they found and searched Davis's Hummer, the back window was broken out and it had plastic taped over the opening.

Davis denied being on the public hunting ground Friday, denied putting the AR-15 under the hay mower, denied being the person who put any of the other recovered items around the Davis property, denied putting the ammunition can in the refrigerator or the gun magazines in the culvert, and denied killing Ross. The prosecutor asked Davis if the fact that his fingerprints were found on evidence near the area where Ross was killed was a coincidence, and Davis responded that he thought "somebody put it there intentionally." He answered, "Right," after the prosecutor asked if he was saying that someone was framing him for the killing of Ross.

Kenneth Brown also testified at trial. He works as a mechanic for a local quarry. The maintenance shed Brown works out of sits next to the public hunting ground. On Friday, November 24, Brown had the day off from work but decided to take advantage of the nice weather to power wash his company service truck. He estimated he got to the shed at about 2:00 p.m. and spent thirty to forty-five minutes cleaning the truck. When he shut off the power washer, he heard "rapid fire shots," which stood out to him as different from what he normally heard coming from the public hunting ground. He estimated the shots were being fired at two shots per second and described hearing three bursts of shooting, with each burst lasting about ten seconds.

After the close of evidence on February 14, 2019, the jury deliberated about three hours and forty-five minutes. It appears it deliberated about another three

hours[4] on February 15 before the court was informed the jury may be deadlocked. Over Davis's objection, the court gave a supplemental instruction, urging the jury to continue deliberating and to try and reach a verdict. The jury deliberated approximately four and a half more hours before it returned a verdict, finding Davis guilty of first-degree murder.

Davis appeals.

## II. Discussion.

### Sufficiency of the Evidence.

Davis challenges the sufficiency of the evidence to support his conviction for first-degree murder. As at trial, Davis does not dispute that Ross was murdered with malice aforethought and premeditation; rather, he argues the evidence is insufficient to prove beyond a reasonable doubt that he is the person who shot and stabbed Ross. *See State v. Hopkins*, 576 N.W.2d 374, 377 (Iowa 1998) ("Substantial evidence is such evidence as could convince a rational fact finder that the defendant is guilty beyond a reasonable doubt.").

The State has the burden to prove every element of the crime with which Davis was charged. *See State v. Armstrong*, 787 N.W.2d 472, 475 (Iowa Ct. App. 2010). In reviewing whether substantial evidence supports his conviction, we review for errors at law. *See id.* "We will uphold a finding of guilt if substantial evidence supports the verdict." *Id.* And "[w]e review the facts in the light most

---

[4] From the trial transcript, we can tell that the jury agreed to begin deliberations at 8:30 a.m. on February 15, and the court instructed them to return to the jury room at that time. But we cannot tell from this record what time the jury actually began deliberating again on February 15. Our calculation of time assumes the jury returned as scheduled.

favorable to the State, including legitimate inferences and presumptions that may reasonably be deduced from the evidence in the record." *Id.*

In challenging the sufficiency of the evidence, Davis focuses on evidence that was never produced to raise questions about the evidence that seems to tie him to the killing. He acknowledges that the gun used to kill Ross was owned by him, had his fingerprints on it, and was recovered on his parents' property where he was living. But he urges us to recognize his claim the gun was stolen before Ross's death; that there were additional, unidentified prints also found on the gun; and fingerprints cannot tell us when he last touched it. He also notes that no one was able to put him at the scene, and none of Ross's missing items or any of Ross's blood were found in Davis's vehicle or on the Davis property (besides on the recovered gun).

But the jury did not have to believe Davis's claim—made after Ross's death—that his gun was stolen from his vehicle. *See State v. Hall*, 214 N.W.2d 205, 210 (Iowa 1974) ("The State rightly claims that the jury was not required to accept all of defendant's testimony."). Someone used the gun owned by Davis to kill Ross, and that gun was recovered on the Davis property. Ross's missing clothing, gear, and phone were never recovered—let alone found on the Davis property. But, based on the timing of Ross's unopened messages and when Kenneth Brown heard the rapid gunshots, Ross was likely killed before 3:00 p.m. on Friday, November 24. No one started looking for Ross until approximately ten hours later, and Davis was not seen by anyone for an additional sixteen hours. Even when Davis was finally seen by his parents, he had been home without them for some period of time before calling them to let them know where he was, giving

him time to change his clothes and shower. And there was some testimony that Davis was in athletic shorts and shirtless when his parents arrived—not what he would have been wearing outside in November for more than a day. That Ross's items were not found on the Davis property and that Davis was not seen in bloody clothes does not mean that Davis is not the killer.

Seemingly recognizing the evidence points to him as the killer, at trial Davis claimed someone intentionally used his gun and then placed it on his parents' property to frame him for the killing of Ross. But other than his general claim, there was no evidence offered to support this theory. And, as the State points out, this would require that someone stole Davis's gun without him knowing and then killed Ross at the exact same time Davis was in hiding due to being on the run from law enforcement and without his cell phones (which otherwise could be used to show his general location and provide an alibi). The perpetrator would then had to have snuck onto the Davis property without being seen to plant the gun with Davis's fingerprints and Ross's blood; the gun was not found in Davis's vehicles or trailer but was instead under a piece of farm machinery. While it is possible the jury could have been convinced by this claim, it was not. And in our review, "[w]e look for substantial evidence, including any inferences arising from the evidence, *to support the jury's verdict.*" *State v. Crone*, 545 N.W.2d 267, 270 (Iowa 1996) (emphasis added).

While there are no eyewitnesses to put Davis even on the public hunting grounds at the time Ross was killed, strong circumstantial evidence supports the jury's determination Davis is the person who shot and stabbed Ross. *See* Iowa R.

App. P. 6.904(3)(p) ("Direct and circumstantial evidence are equally probative.").

Substantial evidence supports Davis's conviction for first-degree murder.

**Jury Instruction on Reasonable Doubt.**

Davis challenges the court's decision regarding the formulation of the reasonable doubt instruction given to the jury. At trial, the court indicated its intention to give this version of the instruction:

> The burden is on the State to prove Ethan Landon Davis guilty beyond a reasonable doubt.
> A reasonable doubt is one that fairly and naturally arises from the evidence in the case, or from the lack or failure of evidence produced by the State.
> If, after a full and fair consideration of all the evidence, you are firmly convinced of the defendant's guilt, then you have no reasonable doubt and you should find the defendant guilty.
> But if, after a full and fair consideration of all the evidence in the case, or from the lack or failure of evidence produced by the State, you are not firmly convinced of the defendant's guilt, then you have a reasonable doubt and you should find the defendant not guilty.

The State agreed with this version being submitted to the jury.

Davis, on the other hand, asked the court to use the updated Model Jury Instruction on reasonable doubt, which included an additional paragraph:

> The burden is on the State to prove Ethan Landon Davis guilty beyond a reasonable doubt.
> A reasonable doubt is one that fairly and naturally arises from the evidence in the case, or from the lack or failure of evidence produced by the State.
> *A reasonable doubt is a doubt based upon reason and common sense, and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.*

> If, after a full and fair consideration of all the evidence, you are firmly convinced of the defendant's guilt, then you have no reasonable doubt and you should find the defendant guilty.
>
> But if, after a full and fair consideration of all the evidence in the case, or from the lack or failure of evidence produced by the State, you are not firmly convinced of the defendant's guilt, then you have a reasonable doubt and you should find the defendant not guilty.

Iowa State Bar Association Uniform Criminal Jury Instruction 100.10 (emphasis added). The court denied his request, relying on the fact that the "old" instruction had "the imprimatur of the Iowa Supreme Court" from its ruling in *State v. Frei*, 831 N.W.2d 70, 79 (Iowa 2013), *overruled on other grounds by Alcala v. Marriott Intern., Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016).

In raising this challenge on appeal, Davis argues it is not clear whether we should review the court's decision regarding which jury instruction to use for an abuse of discretion or errors at law. As Davis notes, "Iowa law requires the court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." *Alcala*, 880 N.W.2d at 707 (quoting *Sonnek v. Warren*, 522 N.W.2d 45, 47 (Iowa 1994)). In these instances, there is "no room for trial court discretion" and we review "for correction of errors at law." *Id.* However, when there is a discretionary component, we review for an abuse of discretion. *Id.*

Davis advocates for an error-at-law review. He does not view the former and current model instructions as just separate, correct descriptions of reasonable doubt. He argues that adding the "hesitate to act" language is not a cumulative addition but rather is an "amplification" of the earlier model instruction. In other words, he believes the requested "hesitate to act" language is a correct statement

of the law that is not embodied in the instructions, which means the court was required to give it. *See id.* In making this argument, Davis relies on *Porter v. Iowa Power & Light Co.*, 217 N.W.2d 221, 234 (Iowa 1974). In *Porter*, the court held "it was reversible error for [the] trial court to refuse plaintiff's requested instruction which would have amplified that concept." 217 N.W.2d at 234. But in *Porter*, reversible error occurred when the district court refused to instruct on a "correct principle of law, applicable to the facts, and *not covered by other instructions.*" *Id.* at 235 (emphasis added).

First, it is not clear to us that the additional language Davis requested is an "amplification" rather than just a different configuration of how to explain the same concept—reasonable doubt. While "the district court is required to instruct the jury as to the law applicable to all material issues in the case," "the court is not required to give any particular form of an instruction." *State v. Becker*, 818 N.W.2d 135, 141 (Iowa 2012), *overruled on other grounds by Alcala*, 880 N.W.2d at 708. n.3. "A trial court is . . . not required to instruct in the language of requested instructions so long as at the topic is covered." *State v. Bolinger*, 460 N.W.2d 877, 880 (Iowa Ct. App. 1990). And, in deciding what language to use "to convey a particular idea to the jury," the trial court's discretion is "rather broad." *Stringer v. State*, 522 N.W.2d 797, 800 (Iowa 1994). We believe our review is for an abuse of discretion.

Next, Davis maintains that even if our review is for an abuse of discretion, he should be successful on appeal because "the mere fact that requested language has not as yet been formally approved in an Iowa Supreme Court

decision does not establish a proper basis for the court's refusal to submit it."[5] This is not an instance where the trial court refused to give an instruction "because it erroneously believed it lack authority" to give that instruction. *See State v. Plain*, 898 N.W.2d 801, 817 (Iowa 2017). The court was required to decide between two requested jury instructions, and, as Davis concedes, the one it ultimately chose was a constitutionally-adequate instruction. We cannot say the district court abused its discretion in making that choice.[6] *See State v. Das*, No. 12-0535, 2013 WL 2370712, at *3 (Iowa Ct. App. May 30, 2013) (finding no abuse of discretion where the trial court gave the reasonable doubt instruction without the "hesitate to act" paragraph instead of the model instruction the defendant requested).

**Davis's Closing Argument.**

Davis argues the district court abused its discretion in preventing defense counsel from using "hesitate to act" language when discussing reasonable doubt during closing argument to the jury. *See State v. Melk*, 543 N.W.2d 297, 301 (Iowa 1995) (deciding the court need not determine whether the district court abused its discretion by limiting closing argument). He maintains counsel should have been

---

[5] The instruction Davis requested has been the model jury instruction for a number of years—since at least 2009. *See Frei*, 831 N.W.2d at 76 n.5. We have not found, and neither Davis nor the State has provided, an Iowa case in which this model instruction has received a stamp of approval. *Cf. State v. Tabor*, No. 10-0475, 2011 WL 238427, at *2 (Iowa Ct. App. Jan. 20, 2011) (affirming the district court when it declined to use the new model instruction with the "hesitate to act" language after finding it was not a correct statement of law because the appellate court's job was "not to determine whether [the defendant's] proposed instruction *also* would have been an accurate statement of law, but whether the instruction actually given was").

[6] Davis suggests the adoption of a new rule that when there are two proposed jury instructions that are both correct statements of law, the defendant whose liberty is at stake gets to choose which alternative is used. We leave this question to our supreme court to decide, if it chooses.

free to use the language since it is not a misstatement of law, regardless of whether it was included in the instruction to the jury. *See Victor v. Nebraska*, 511 U.S. 1, 20 (1994) ("[T]he instruction provided an alternative definition of reasonable doubt: a doubt that would cause a reasonable person to hesitate to act. This is a formulation we have repeatedly approved.").

During the defense's closing, the following took place:

> PROSECUTOR: Judge, I'm going to object to the language that's on this particular slide. It is not the proper instruction.
> DEFENSE COUNSEL: I'm not saying that's the instruction, Judge.
> PROSECUTOR: He can't redefine it.
> DEFENSE COUNSEL: I'm not saying that's the instruction.
> PROSECUTOR: Can we approach, Judge?

At this point, a bench conference was held off the record. The court did not rule on the objection on the record, and it is unclear what happened to the slide that was being shown to the jury. Defense counsel did not use the "hesitate to act" language during closing, but without further record, we cannot know whether defense counsel agreed to change tactics during the bench conference. "It is the appellant's duty to provide a record on appeal affirmatively disclosing the alleged error relied upon." *Mumm v. Jennie Edmundson Memorial Hospital*, 924 N.W.2d 512, 520 (Iowa 2019) (quoting *In re F.W.S.*, 698 N.W.2d 134, 135 (Iowa 2005)). We cannot find an abuse of discretion on this record. *See Estes v. Progressive Classic Ins. Co.*, 809 N.W.2d 111, 115–16 (Iowa 2012) ("Failure to provide a record requires us to affirm the district court's judgment.").

**Instruction to Deadlocked Jury.**

Davis argues the district court abused its discretion in giving the deadlocked jury a supplemental verdict-urging instruction rather than telling the jurors to re-

read the instructions already given to them. *See State v. Campbell*, 294 N.W.2d 803, 808–09 (Iowa 1980) ("[W]e are mindful that the trial judge has considerable discretion in determining whether the verdict-urging instructions should be given and that each case is to be decided on its own circumstances."); *Alcala*, 880 N.W.2d at 707 (holding that review of jury instructions is for errors of law "absent a discretionary component").

After almost seven hours of deliberation, the court was informed the jury may be deadlocked. Outside the presence of the jury, the court told the parties it "intend[ed] to give what we call an *Allen* charge[7] to the jury concerning further deliberations." The additional instruction the court intended to give the jury was generally the same as the one given in *State v. Parmer*, No. 13-2033, 2015 WL 2393652, at *6–7 (Iowa Ct. App. May 20, 2015). Davis objected, arguing the additional instruction "seems . . . to have a coercive effect on jurors." He asked the court to instead instruct the jury to reread the instructions it had already been given and continue deliberations. Over Davis's objection, the court instructed the jury:

> You've been deliberating on this case now for a considerable period of time, yesterday afternoon and most of this morning, and the Court deems it proper to advise you further in regard to the desirability of agreement, if possible.
>     The case has been exhaustively and carefully tried by both sides and has been submitted to you for decision and verdict, if possible. It's the law that a unanimous verdict is required, and while this verdict must be the conclusion of each juror and not mere acquiescence of the jurors in order to reach an agreement, it is still necessary for all jurors to examine the issues and questions submitted to them with candor and fairness and with proper regard for, and deference to, the opinion of each other.

---

[7] The common name for verdict-urging instructions comes from *Allen v. United States*, 164 U.S. 492, 500–02 (1896).

A proper regard for the judgment of others will greatly aid us in forming our own judgment. So each juror should listen to the arguments of the other jurors with a disposition to be convinced by them, and if the members of the jury differ in their views of the evidence, such difference of opinion should cause them to scrutinize the evidence more closely and to reexamine the grounds of their problem.

Your duty is to decide the issues of fact which have been submitted to you, if you can conscientiously do so.

In conferring, you should lay aside all mere pride of opinion and should bear in mind that the jury room is no place for espousing and maintaining in a spirit of controversy either side of a cause. The aim ever to be kept in view is the truth as it appears from the evidence, examined in the light of the instructions of the Court.

So you will again retire to the jury room, examine your differences in the spirit of fairness and candor, and try to arrive at a verdict. So I am advising you to please continue to review the evidence, review the jury instructions that have been provided to you, and continue your deliberations.

So at this time I'll have the court attendant return you to the jury room.

About four and a half hours later, the jury returned a verdict finding Davis guilty of first-degree murder.

Our supreme court has questioned the propriety of giving a verdict-urging instruction. *See Campbell*, 294 N.W.2d at 808–09. But it is have never said that giving such an instruction is error per se. *Id.* at 809. Rather, "[t]he ultimate test is whether the instruction improperly coerced or helped coerce a verdict or merely initiated a new train of real deliberation which terminated the disagreement." *Id.* at 808. In deciding this, the content of the instruction is only one factor to consider. *State v. Wright*, 772 N.W.2d 774, 777–78 (Iowa Ct. App. 2009). "The supplemental charge must be evaluated 'in its context and under all the circumstances.'" *Id.* at 778 (quoting *State v. Piper*, 663 N.W.2d 894, 911–12 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010)). "Factors that might suggest a coercive effect include 'an inquiry into the jury's numerical

division, a speedy verdict after receiving the supplemental instruction, and language instructing the jury it must make a decision.'" *Id.* (citation omitted).

As we noted before, the language of the verdict-urging instruction given to the jury here was generally the same as the instruction approved by a panel of this court in *Parmer*, 2015 WL 2393652, at *6. And in *Parmer*, the panel noted the language was "strikingly similar to the *Campbell* instruction," where our supreme court found no error was committed in giving the instruction. 2015 WL 2393652, at *6 (citing *Campbell*, 294 N.W.2d at 809). And in both *Parmer* and *Campbell*, the jury deliberated only two and a half hours after receiving the instruction. *Campbell*, 294 N.W.2d at 811 (noting the record did not verify defendant's claim jury deliberated another two and a half hours but, assuming the "time assertions are correct, we do not find that they demonstrate coercion"); *Parmer*, 2015 WL 2393652, at *7. In both instances, the courts found this length of additional deliberation did not "demonstrate coercion*." Id.* Here, the jury deliberated almost four and a half hours longer before returning a verdict.

On at least two occasions, our court has not found an abuse of discretion when the district court used the same general verdict-urging language as is being challenged here and the jury deliberated a shorter time period following the instruction. *See Parmer*, 2015 WL 2393652, at *7; *State v. Power*, No. 13-0052, 2014 WL 2600214, at *4–5 (Iowa Ct. App. June 11, 2014). None of the context or circumstances present in Davis's case leads us to a different result. We cannot say the district court abused its discretion in giving the jury this verdict-urging instruction.

**Question of Burden Shifting.**

Davis asserts the State impermissibly shifted the burden of proof to him during redirect examination of the State's witness who completed the fingerprinting analysis, Dennis Kern, and during the State's rebuttal closing argument.

During cross-examination of Kern, Davis questioned him about a number of items that were either submitted but not tested for fingerprints or recovered items that were not even submitted for possible testing, and unidentified fingerprints from some of the submitted items. As we noted before, Davis's defense strategy was that some unidentified person used his gun to kill Ross. On redirect examination, the State asked Kern whether, in cases where lots of things were submitted for fingerprint testing, he had been involved in discussions about what to examine based on what particular value the findings may have to the investigation. Kern noted he had, testifying, "[T]here's a point where additional work becomes counterproductive." Then the following exchange occurred:

> PROSECUTOR: And, Mr. Kern, ultimately in this investigation, you assisted in hopefully making a determination as to who was responsible for Curtis Ross's death; is that right?
> WITNESS: My interest from the onset—I knew at the onset of the investigation that there were no individuals who were immediately to the attention of law enforcement. And when the evidence came in, the intent was to process it, to associate evidence from the scene with some individual, and hopefully that would give us a person of interest, somebody who could be the starting point of the investigation . . . . And that was exactly what the intent and why we started. That evidence came in early in the morning. They had an answer in the afternoon, and it was to be able to give a direction and a place to start.
> PROSECUTOR: And whether that was Ethan Davis or some other person, that didn't matter to you; correct?
> WITNESS: Didn't care. All I wanted was to be able to see if we could give a starting place for the investigation.

PROSECUTOR: All of the items that [defense counsel] talked about that were not examined by you, would they have been kept in evidence and been available to re-examine, if needed?

DEFENSE COUNSEL: Objection. Irrelevant. Also a violation of burden of proof.

PROSECUTOR: It's not. He brought this issue up as to what was not tested. He has opened this door.

THE COURT: Overruled.

PROSECUTOR: Was it available to be re-examined if that is, in fact, what needed to be done.

WITNESS: Yes, sir.

Later, during the State's rebuttal closing argument, the following took place:

PROSECUTOR: There is no corroboration, none, of any setup or frame job of Ethan Davis. Zero. No evidence. Only his testimony—that's it—uncorroborated that he claims that somebody had it out for him. No person has ever been identified as having a motive to frame Ethan Davis. He didn't suggest a name. His folks didn't suggest a name. People that knew him didn't suggest a name. Police didn't find anybody. There was nothing that was brought to them that would suggest that he was framed for Curt Ross's murder. Who would do it? Who would frame Ethan Davis? Give me a name.

DEFENSE COUNSEL: Your Honor, I'm going to object. This shifts the burden . . . of proof away from the State and requires me to go forward and present another speculative theory about other individuals that, frankly, is not part of our burden.

THE COURT: [Prosecutor], I'm going to instruct you not to suggest that the burden ever shifts to the defendant from the State. And you may continue with your closing.

PROSECUTOR: I don't believe that I'm doing that, Your Honor. This was—this came up during the defendant's testimony, evidence he presented. That's what I intend to comment on.

THE COURT: All right. Comment on the evidence presented.

PROSECUTOR: What connection does anyone else—what evidence was discovered in this case that would have any other connection [to] anyone else—any other connection to Curt Ross's death? Anyone else's gun? Was Curtis Ross's DNA found on anyone else's property? No. None.

As to Davis's first complaint, regarding the court overruling his objection to the prosecutor's question to Kern regarding whether the items that were submitted but not initially tested could have been tested later, we do not understand this question to suggest Davis could or should have tested the items. Rather, we understand

this to suggest that if the initial name given to police for investigation as a possible suspect—Davis's name—did not pan out, more fingerprint testing could have been completed by Kern or someone else at the DCI on the submitted items in an attempt to identify other fingerprints. *Cf. State v. Christensen*, 929 N.W.2d 646, 659–60 (Iowa 2019) (finding the State crossed the lines established by *Hanes* when it elicited testimony that the physical evidence was available for testing by others); *Hanes*, 790 N.W.2d at 556 (holding the State bears the burden of proof in a criminal prosecution and that it was improper for the State to attempt to shift the burden to the defense by suggesting the defendant could have called additional witnesses). The court did not abuse its discretion in overruling this objection. *See State v. Smith*, 876 N.W.2d 180, 184 (Iowa 2016) ("[W]e recognize we may affirm a ruling on the admission of evidence by using a different rationale than relied upon by the district court.").

As to Davis's second complaint, regarding his objection for burden-shifting during the State's rebuttal closing argument, it is not clear to us this objection was overruled. And Davis did not ask for any other remedy, such as a curative instruction from the court or a mistrial. *See Christensen*, 929 N.W.2d at 660 ("[C]urative instructions are generally sufficient to cure most trial errors."). Additionally, it is not improper "for the prosecutor to make statements aimed at the theory of the defense." *State v. Coleman*, 907 N.W.2d 124, 140 (Iowa 2018). The State can reference an absence of evidence supporting the defense's theory of the case. *See Hanes*, 790 N.W.2d at 557. During the rest of the rebuttal, the State focused on why a person trying to frame Davis would hide and destroy so much

evidence rather than placing evidence seeming to tie Davis to the killing in more obvious places, such as his vehicle that was missing a back window or his camper.

In this context, when it seems the district court sustained Davis's objection to the prosecutor's comment during closing and, either way, Davis asked for no further remedy, we cannot say Davis was prejudiced to the extent a new trial is warranted. *See Melk*, 543 N.W.2d at 301 ("The scope of closing arguments, however, is not strictly confined, but rests largely with the sound discretion of the trial court.").

**Sentencing Order.**

At the sentencing hearing, the court indicated Davis would not be required to pay restitution for court costs or legal assistance fees. However, the court's written sentencing order, filed the same day, imposed those obligations. When "there is a discrepancy between the oral pronouncement of sentence and the written judgment and commitment, the oral pronouncement of sentence controls." *State v. Hanes*, 533 N.W.2d 525, 528 (Iowa 1995) (citations omitted). Davis asks that we remand for the entry of a nunc pro tunc order removing the court cost and attorney fee obligations from the sentencing order, and the "State agrees that the sentencing order should be corrected as Davis describes."

**III. Conclusion.**

We affirm Davis's conviction for first-degree murder. We remand to the district court for the limited purpose of entry of a nunc pro tunc order removing the court-cost and attorney-fee obligations from the sentencing order.

**AFFIRMED AND REMANDED FOR ENTRY OF NUNC PRO TUNC ORDER.**